**Marshall GARVIN, Plaintiff,**

v.

**John E. POTTER, Postmaster General, United States Postal Service, Defendant.**

No. 00 Civ. 6789(JGK).

United States District Court, S.D. New York.

April 22, 2005.

### OPINION & ORDER

KOELTL, District Judge.

The plaintiff, Marshall Garvin ("Garvin"), a former postal worker, brings this action against the defendant, John E. Potter ("Potter"), Postmaster General of the United States Postal Service (the "USPS"). The amended complaint alleges sixteen causes of action against the defen-

dant. The first, third, and fifth causes of action allege discrimination based on disability under the New York State Human Rights Law, Executive Law §§ 290 *et seq.* ("NYHRL"); the New York City Human Rights Law, Administrative Code of the City of New York §§ 8–101 *et seq.* (the "NYCHRL"), and the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 *et seq.* (the "ADA"), respectively. The second, fourth, and sixth causes of action allege that the defendant retaliated against the plaintiff for reporting the alleged discrimination based on disability, in violation of the NYHRL, the NYCHRL, and the ADA, respectively. The seventh, ninth, and eleventh causes of action allege religious discrimination under the NYHRL, the NYCHRL, and Title VII of Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), respectively. The eighth, tenth, and twelfth causes of action allege that the defendant retaliated against the plaintiff for reporting the alleged religious discrimination, in violation of the NYHRL, the NYCHRL, and Title VII, respectively. The thirteenth, fourteenth, and fifteenth causes of action allege that the defendant created a hostile work environment for the plaintiff, in violation of the NYHRL, the NYCHRL, and Title VII, respectively. The sixteenth cause of action alleges breach of contract. The plaintiff also appears to allege a claim for constructive discharge as a result of alleged retaliatory harassment. (Amd.Compl., ¶ 11.)

The defendant now moves pursuant to Federal Rule of Civil Procedure 56 for summary judgment dismissing all claims against him.

## I.

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Gallo v. Prudential Residential Servs. Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir.1994). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo*, 22 F.3d at 1224. The moving party bears the initial burden of informing the district court of the basis for its motion and identifying the matter that it believes demonstrates the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. The substantive law governing the case will identify those facts that are material and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Consol. Edison, Inc. v. Northeast Utilities*, 332 F.Supp.2d 639, 642 (S.D.N.Y.2004).

Summary judgment is appropriate if it appears that the non-moving party cannot prove an element that is essential to the non-moving party's case and on which it will bear the burden of proof at trial. *See Cleveland v. Policy Mgt. Sys. Corp.*, 526 U.S. 795, 805–06, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999); *Celotex*, 477 U.S at 322, 106 S.Ct. 2548; *Powell v. Nat. Bd. of Med. Exam'rs*, 364 F.3d 79, 84 (2d Cir. 2004). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.

*See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)); *see also Gallo*, 22 F.3d at 1223. Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. *See Chambers v. T.R.M. Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir.1994). If the moving party meets its initial burden of showing a lack of a material issue of fact, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." *Ying Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir.1993); *see also Scotto v. Almenas*, 143 F.3d 105, 114–15 (2d Cir. 1998); *Consol. Edison*, 332 F.Supp.2d at 643.

## II.

The following facts are undisputed unless otherwise noted.

The plaintiff was employed by the USPS from February 18, 1967, until his retirement on February 22, 2002. (Affidavit of Marshall Garvin, sworn to Sept. 13, 2004 ("Garvin Aff."), ¶ 5.) The plaintiff was a full time route carrier for the USPS from July 1968 until retirement. (*Id.*) During this period, the plaintiff was stationed at the Kingsbridge Post Office in the Bronx. (Transcript of Feb. 20, 2003 deposition of Marshall Garvin ("Garvin Feb. Dep."), attached as Ex. A to the Declaration of Megan L. Brackney dated July 16, 2004 ("Brackney Decl."), at 14–15.)

The plaintiff is a Modern Orthodox Jew. (*Id.* at 198.) The plaintiff observes the Sabbath from Friday evening until Saturday evening in accordance with Modern Orthodox Judaism, meaning that, during this period, the plaintiff does not work or use his car, telephone, or television. (*Id.*; Garvin Aff., ¶ 3.) The plaintiff also observes the Jewish holidays and follows the Jewish dietary laws, which allow him to buy and eat only Kosher foods and to patronize only Kosher establishments. (*Id.*) Because of his religious observance, the plaintiff was not required to work on Saturdays or Jewish holidays during his employment at the USPS from February 1967 until his retirement. (Transcript of Aug. 20, 2003 deposition of Marshall Garvin ("Garvin Aug. Dep."), attached as Ex. B to Brackney Decl., at 223, 249.)

The plaintiff suffers from *stacis dermatitis*, or leg and ankle ulcerations, and varicose veins. (Garvin Aff., ¶ 4.) The plaintiff was first diagnosed as suffering from these conditions in July 1984. (Garvin Feb. Dep., at 78.) The plaintiff alleges that these conditions cause him severe pain and swelling, particularly during the summer, when he cannot wear support hose and a dressing wrap known as an "unna boot." (Garvin Aff., ¶ 4.) The plaintiff alleges that, during the summer, the constant walking required on his mail route, combined with the warm temperature, aggravated the swelling of his legs and caused occasional bleeding and severe pain, which slowed his work pace. (*Id.*) As a result of these conditions, the plaintiff's doctors instructed him to wear soft shoes or slippers and not to work over eight hours per day. (*Id.*, ¶ 7; Transcript of Mar. 22, 2004 deposition of Marshall Garvin, ("Garvin Mar. Dep.") attached as Ex. C to Brackney Decl., at 46–47.) The plaintiff submitted doctors' notes to this effect to his supervisors and managers at the USPS, including but not limited to Sandy Simon ("Simon"), Tosha Dennis ("Dennis"), Walter Molia ("Molia"), and John

Raciti ("Raciti"), requesting that he not be required to work any overtime. (Garvin Aff., ¶ 7, 8.) The plaintiff did not work any overtime hours from 1984 until his retirement. (Garvin Aug. Dep. at 374–75.)

As a mail carrier, the plaintiff generally had two direct supervisors who were supervised by the station manager. (Garvin Feb. Dep. at 19–20.) From 1997 until 2001, the plaintiff's direct supervisors included Sloane Williams ("Williams"), who supervised the plaintiff from mid–1997 through 1998, Kendra Barrett ("Barrett") and Dennis, who supervised the plaintiff from October 1998 until January 2000, Simon, who supervised the plaintiff from June 1998 until November 2001, and Molia, who supervised the plaintiff from October 1998 until December 2001. (Transcript of Mar. 18, 2004 deposition of John Raciti ("Raciti Dep."), attached as Ex. E to Brackney Decl., at 17–20; Garvin Feb. Dep. at 79–80, 85, 105–06, 116, 137, 147). Henry Reyes ("Reyes") was the Station Manager at Kingsbridge from June 1996 until June 1998. (Garvin Feb. Dep. at 20.) Raciti replaced Reyes, and served as the Station Manager from June 1998 until November 2001. (Garvin Feb. Dep. at 97.) The station manager is supervised by an area manager, who in turn is supervised by the Bronx Postmaster. (Transcript of Mar. 15, 2004 deposition of Tony Rosario ("Rosario Dep."), attached as Ex. D to Brackney Decl., at 6, 24–25.) Tony Rosario ("Rosario") has been the Bronx Postmaster since 1996. (Rosario Dep. at 6.)

The plaintiff alleges that he suffered religious discrimination and was subjected to a hostile work environment because of his religious beliefs while he was employed by the USPS. The plaintiff alleges that his supervisors and managers failed to instruct the sub-carriers who delivered mail to his route on Saturdays to deliver the full volume of mail, purposefully ensuring that the plaintiff would have to deliver an inor-dinately large volume of mail on Mondays as a punishment for his being absent on Saturdays. The defendant alleges that, when the plaintiff complained about this situation on one occasion, Raciti investigated and discovered that Miriam Ramirez, an acting supervisor on Saturdays, was not delivering all of the mail on several routes, including the plaintiff's route, and that Raciti subsequently demoted Ramirez. (Raciti Dep. at 22–30.) The plaintiff alleges, however, that the instructions not to deliver mail on his route on Saturdays continued under other supervisors, and that Williams, Dennis, Simon, and Molia often "low-counted" his mail, purposefully recording a lower volume of mail than he had to deliver. (Garvin Feb. Dep., at 85–88, 106–09, 111–12, 117–119, 139.)

The plaintiff also alleges that Raciti, Williams, Dennis, Simon, and Molia made "inappropriate and offensive comments" to the plaintiff concerning his religious observance. (Garvin Aff., ¶ 6.) The plaintiff alleges that Simon and Raciti repeatedly asked him if he could work on Saturdays, knowing that he could not because of his religious beliefs. (*Id.*) The plaintiff also alleges that, on or about June 16, 1997, when he complained to Simon and a temporary supervisor about the large volume of mail that he alleges was not delivered on Saturdays so that he would face a larger quantity Monday morning, their response was: "If you want something done, come in on Saturdays." (*Id.*) The plaintiff alleges that, on or about October 30, 1997, Williams asked him, "Can't you get the Rabbi to give you a pardon to come in on Saturday? I need you." (*Id.*) The plaintiff alleges that, on November 3, 1997, Williams made another remark, this time directed at both his religion and his disability, saying, "You're the best carrier here. The only problem is that you spend too much time in the synagogue and the doctor's office." (*Id.*) The plaintiff also

alleges that, on or about August 18, 1999, during a break from an arbitration concerning disciplinary measures taken against the plaintiff, Dennis told the plaintiff that she was under orders from Raciti to discipline the plaintiff because he was not flexible enough about his religion. (*Id.;* Garvin Feb. Dep. at 47–49.) In her deposition, Dennis acknowledged having told the plaintiff during a break from an arbitration that he should be flexible, but denied that the comment concerned the plaintiff's religion or disability. (Transcript of Mar. 22, 2004 deposition of Tosha Dennis ("Dennis Dep."), attached as Ex. F to Brackney Decl., at 14–17.)

The plaintiff also alleges that his supervisors and managers, specifically Raciti and Frank Leto, were unreasonable regarding his need to request time off for the Jewish holidays. The plaintiff alleges that whenever he wanted time off for a Jewish holiday, he was required to show proof of the holiday by bringing in a calendar. (Garvin Feb. Dep. at 70; Garvin Aug. Dep. at 223.) In addition, the plaintiff alleges that his requests for leave for Jewish holidays were often not returned within 72 hours as USPS supervisors and managers are required to do, and that consequently Garvin sent the requests by certified mail. (Garvin Feb. Dep. at 71–76.) The plaintiff alleges that on another occasion, Raciti answered a request for absence during the Jewish holiday of Passover with an insult. (Garvin Feb. Dep. at 72.) In his deposition, Raciti denied having made the statement, and claims that he only refused requests that were submitted through certified mail because that was not the proper procedure, and that any request not returned within 72 hours was automatically granted. (Raciti Dep. at 54–58.) The plaintiff acknowledged that he was in fact paid for the requested time off for Passover. (Garvin Feb. Dep. at 76) The plaintiff also conceded that he was never required to work and was not disci-plined for not working on the Sabbath or any other Jewish holiday, and that he never lost pay for not working on the Sabbath or any other Jewish holiday. (Garvin Aug. Dep. at 223–24.)

The plaintiff alleges that he was discriminated against and faced a hostile work environment because of his alleged disability—namely, his condition of having leg and ankle ulcerations and varicose veins. The plaintiff alleges that, from June 15, 1998 until Raciti left the station in November 2001, Simon, Dennis, Molia, and Raciti repeatedly requested that the plaintiff work overtime despite the fact that the plaintiff had provided them doctors' notes stating that he could not work more than eight hours each day. (Garvin Aff., ¶ 7.) The plaintiff alleges that his supervisors and managers forced him to bring in doctors' notes for all medical absences. (Garvin Feb. Dep. at 124–25.) The plaintiff alleges that USPS rules only require documentation for an absence of three days or more. (*Id.*) The plaintiff admits that he did eventually receive pay for his sick leave, but argues that his supervisor purposefully delayed processing his requests by two or three days. (*Id.* at 142.)

The plaintiff alleges that his supervisors attempted to force him to work overtime, even though his doctor had advised him not to work more than eight hours each day. (Garvin Feb. Dep. at 50–51.) On January 19, 1999, the plaintiff requested two hours of assistance to complete his route, and Dennis provided the plaintiff with one and a half hours of assistance, directing him to work a half hour overtime to complete his route. (Brackney Decl., Ex. N.) The defendant alleges that the plaintiff refused to work overtime, and instead left the undelivered mail in an apartment building and returned to the post office without notifying Dennis that he was unable to complete his route. (*Id.*) Dennis

issued the plaintiff a fourteen-day suspension for failure to follow instructions. (*Id.*) Dennis testified that she had not been aware at the time that the plaintiff had a medical condition that prevented him from working overtime. (Dennis Dep. at 30–35.) She also alleged that the suspension was issued because the plaintiff left the undelivered mail in the building rather than following Dennis' instructions to call her if he needed additional assistance. (Dennis Dep. at 27–28.) In response to the suspension, the plaintiff filed a grievance and an arbitration hearing was held. (Brackney Decl., Exs. O, P.) The arbitrator found that the USPS had just cause to issue the suspension, but reduced the suspension to a letter of warning because the decision to issue a suspension was based on previous disciplinary actions that had subsequently been reduced. (Brackney Decl., Ex. P.)

The plaintiff also alleges that he was disciplined for wearing sneakers or slippers in accordance with his doctors' instructions. The plaintiff alleges that on one occasion, when working at the post office before going out on his route, he was wearing slippers to alleviate the pain in his legs, but Dennis required him to change from slippers into his uniform shoes. (Garvin Aff., ¶ 8.) It appears from a letter of warning issued to the plaintiff that this exchange took place on August 18, 1999. (Letter of warning in lieu of suspension dated Aug. 19, 1999, attached as Ex. T to Brackney Decl.) The plaintiff alleges that when he tried to explain that he was wearing the slippers for health reasons, Dennis replied, "I don't want to hear it." (Garvin Aff., ¶ 8.) On or about October 28, 1999, the plaintiff alleges, Molia sent him home from work because the plaintiff was wearing sneakers and was therefore out of uniform. (*Id.*) The plaintiff alleges that three other mail carriers also were not wearing uniform shoes. (Garvin Aff., ¶ 8.) In his deposition, however, the plaintiff

stated that he had been wearing slippers, not sneakers. (Garvin Mar. Dep. at 33–34, 55–56.) The plaintiff also stated that slippers were not permitted on the work floor because they posed a safety hazard. (Garvin Mar. Dep. at 57.)

The plaintiff alleges that he was often denied assistance when he could not finish his route within eight hours. The procedure for granting assistance is that a carrier must request assistance from his supervisor, who may then grant the request by sending another carrier to complete a portion of the route. (Garvin Mar. Dep. at 68.) Under USPS rules, a carrier could receive at most two hours of assistance with his route per day. (*Id.*) The plaintiff asked for assistance most frequently on Mondays. (*Id.* at 69.) The plaintiff received assistance 25% of the times that he requested it, and two out of four Mondays each month. (*Id.* at 70–71; Garvin Aug. Dep. at 219.)

The plaintiff also alleges that the defendant subjected him to harassment from his managers and supervisors, although the specific incidents were verbal instructions to comply with various work rules. He alleges that on one occasion, Dennis ordered him not to use his mobile phone on the work floor when he was calling his doctor for a medical emergency. (Garvin Feb. Dep. at 137–39.) The plaintiff concedes that postal workers are prohibited from using their mobile phones on the work floor, but alleges that several other employees were allowed to use their phone without being reprimanded. (*Id.* at 138, 140–41.) The plaintiff also claims that Molia followed him on his route repeatedly and harassed the plaintiff for using his own car to deliver the mail. (*Id.* at 116–18.) The plaintiff concedes that postal workers are prohibited from using their own vehicles to deliver the mail, but alleges that other workers were allowed to use

their cars without being questioned about it. (*Id.* at 123.) The plaintiff also alleges that, on January 11, 1999, Barrett did not allow him to buy stamps from postal workers behind the counter. (*Id.* at 150–51.) Although Garvin concedes that postal workers were prohibited from making such "back door" transactions, the plaintiff alleges that the practice was common and he was singled out for enforcement of the prohibition. (*Id.*)

The plaintiff also alleges that the defendant did not properly respond to the plaintiff's complaints that he was being harassed by David Asher, a postal patron, and that Rosario conspired with Asher to force the plaintiff from his job. (Garvin Aff., ¶ 12; Garvin Feb. Dep. at 33, 36–37; Garvin Aug. Dep. at 297, 377; Garvin Mar. Dep. at 97.) The dispute between the plaintiff and Asher began shortly after plaintiff began delivering mail to Asher's home in 1996. (Garvin Feb. Dep. at 29, 32; Garvin Aug. Dep. at 342.) Between 1997 and 2001, the plaintiff lodged fourteen complaints with the police against Asher. (Garvin Aug. Dep. at 284.) The plaintiff alleges that on September 4, 1997, Asher struck the plaintiff and threatened to kill him. (Garvin Feb. Dep. at 32; Garvin Mar. Dep. at 85, 88–89.) The plaintiff's supervisor, by order of Raciti, subsequently directed the plaintiff to stop delivering mail at Asher's building for a few weeks. (Brackney Decl., Ex. AF; Garvin Aug. Dep. at 312; Garvin Mar. Dep. at 87; Raciti Dep. at 96–97.) The plaintiff resumed delivering mail to Asher's address on November 12, 1997, but continued to have conflicts. (Garvin Aug. Dep. at 315.) The USPS had postal inspection services following him to monitor the situation. (Garvin Mar. Dep. at 88–89.) The plaintiff was required to work indoors for one month, and Asher's address was permanently reassigned to another carrier. (Garvin Mar. Dep. at 90–93.)

The plaintiff alleges that he was harassed and threatened by Rosario as a result of Asher's complaints. The plaintiff alleges that, on May 15, 1997, Rosario received numerous complaints from Asher about the plaintiff, all of which the plaintiff alleges were false. (Garvin Aff., ¶ 10.) The plaintiff alleges that Rosario told the plaintiff, "Sooner or later, you're going to fuck up, and when you do, I am going to be there to catch you and put my foot up your ass." (*Id.*) On or about November 11, 1997, the plaintiff alleges, Rosario threatened him at an office-wide meeting on the work floor, stating that he had received complaints at a town hall meeting about a carrier who delivered mail to Dr. Asher's building who "[stuck] out like a sore thumb," and that the next time the carrier stuck out like a sore thumb, Rosario would break the carrier's thumb. (*Id.*, ¶ 11; Garvin Feb. Dep. at 44–46, 164–65.) The plaintiff alleges that it was obvious that Rosario was referring to the plaintiff, because Dr. Asher's residence was on the plaintiff's route. In his deposition, Rosario denied making the May 15, 1997, comment. (Rosario Dep. at 32–35.) Rosario stated that the November 11, 1997, comment referred to complaints he had received but denied that the comment referred to the plaintiff or 3530 Henry Hudson Parkway or contained a threat to break anyone's thumb. (*Id.*) The plaintiff filed a complaint with the United States Equal Employment Opportunity Commission (the "EEOC") in response to each alleged threat. (Garvin Aff., ¶ 10, 11; Brackney Aff., Exs. AI, AH.)

The plaintiff also alleges that, because he reported these alleged threats and complained about the allegedly discriminatory behavior described above, he was targeted for disciplinary action. The plaintiff alleges that he was disciplined on thirteen separate occasions from October 1998 until June 2000. (Garvin Aff., ¶ 13.) The par-

ties have provided evidence of eleven separate disciplinary actions within this time period. (Brackney Decl., Exs. H, J, N, Q, S, T, W, Y, AA, AB, AD.) The plaintiff filed grievances in response to all but one of these disciplines. Nine of the ten disciplinary measures against which the plaintiff filed a grievance were subsequently rescinded, expunged, or reduced. (Brackney Decl., Exs. I, K, M, P, R, T, V, X, Z, AC.) Only one of the disciplines against which the plaintiff filed a grievance was sustained in its entirety. (Brackney Decl., Ex. AE.)

Only one disciplinary action resulted in a suspension that the plaintiff was required to serve. On June 24, 1999, the plaintiff was issued a notice of removal on a charge that he failed to place mail in mail receptacles. (Brackney Decl., Ex. S.) The notice of removal was subsequently reduced to a seven-day suspension. (Brackney Decl., Ex. T.) The only discipline that was sustained in its entirety after the plaintiff disputed it occurred on June 12, 2000. On that date, the plaintiff received a seven-day "paper" suspension for failure to follow instructions. (Brackney Decl., Ex. AD.) The "paper" suspension did not require the plaintiff to take time off from work. (Id.) The plaintiff filed a grievance, an arbitration hearing was held, and the suspension was upheld—the only discipline to be sustained completely. (Brackney Decl., Ex. AE.)

On February 26, 1998, the USPS Human Resources Manager, James Connolly, held a meeting with the plaintiff, the plaintiff's mother, and several members of the USPS management. (Connolly Agreement, attached as Ex. F to Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Opp.Mem.").) The participants signed an agreement (the "Connolly Agreement") providing that the plaintiff would be treated like all other employees at the Kings-bridge Station. (Id.) The Connolly Agreement provided that it was to remain in effect so long as the plaintiff was actively employed by the USPS. The plaintiff alleges that discrimination and retaliation continued after the signing of the Connolly Agreement, constituting a breach of the Agreement. (Amd.Compl., ¶ 12.)

The plaintiff alleges that the hostile environment and retaliation created by the defendant forced him to retire. (Amd. Compl., ¶ 11.) The plaintiff retired from the USPS in February 2002. (Garvin Aff., ¶ 5.)

### III.

#### A.

■ The plaintiff's claims under the NYHRL and the NYCHRL alleging religious discrimination or retaliation for complaints about such discrimination are barred because Title VII is the exclusive remedy for federal employees alleging employment discrimination based on race, color, religion, sex, or national origin. *See Brown v. General Serv. Admin.*, 425 U.S. 820, 832–35, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976); *Lewis v. Snow*, No. 01 Civ. 7785, 2003 WL 22077457, at *11 (S.D.N.Y. Sep.8, 2003) (dismissing plaintiff's New York State law claim for employment discrimination); *O'Brien v. Frank*, No. 88 Civ. 5536, 1994 WL 440730, at *2 (S.D.N.Y. Aug.12, 1994). To allow the plaintiff to go forward with his claims under state law and New York City law would be inconsistent with the holding in *Brown v. Gen. Servs. Admin.*, in which the Supreme Court found that allowing an identical claim of employment discrimination to be pursued against the government through other statutes would render meaningless the "rigorous administrative exhaustion requirements and time limitations" of Title VII and would eliminate the "crucial administrative role that each agency . . . was

given by Congress in the eradication of employment discrimination." *Brown*, 425 U.S. at 833, 96 S.Ct. 1961; *see also Di-Pompo v. West Point Military Academy*, 708 F.Supp. 540, 544 (S.D.N.Y.1989).

■ The plaintiff's claims under the NYHRL and the NYCHRL alleging discrimination based on his alleged disability or retaliation for complaints about such discrimination are also barred because the Rehabilitation Act is the exclusive remedy for federal employees alleging disability discrimination. Although *Brown* concerned discrimination based on race, color, religion, sex, or national origin, the Supreme Court's holding in *Brown* that Title VII is the exclusive remedy for federal employees alleging discrimination also applies to disability discrimination in violation of the Rehabilitation Act,[1] because Congress made the remedies set forth in Title VII available to all federal employees alleging discrimination based on disability under the Rehabilitation Act. 29 U.S.C. § 794a(a)(1). *See Rivera v. Heyman*, 157 F.3d 101, 103–05 (2d Cir.1998) (dismissing federal employee's employment discrimination claims under NYHRL and NYCHRL because Rehabilitation Act provides sole remedy for federal employee alleging disability discrimination); *DiPompo*, 708 F.Supp. at 544 (dismissing federal employee's claims of employment discrimination based on disability under NYHRL because such claims can arise only under the Rehabilitation Act, which was effectively incorporated into Title VII by 29 U.S.C. § 794a(a)(1)).

Therefore, the defendant's motion for summary judgment is granted dismissing the plaintiff's first, second, third, fourth, seventh, eight, ninth, tenth, thirteenth, and fourteenth causes of action.

**B.**

**1.**

The plaintiff originally asserted his fifth and sixth causes of action under the ADA. The defendant argued correctly in support of the current motion that the USPS is not an "employer" within the meaning of the ADA and thus the plaintiff has no remedy for employment discrimination under the ADA. *See* 42 U.S.C. §§ 12111(2) & 5(B)(i); *Rivera*, 157 F.3d at 103–04; *White v. U.S. Postal Serv.*, No. 01 Civ. 499, 2002 WL 31466767, at *1 (S.D.N.Y. Oct. 31, 2002). In response, the plaintiff withdrew his fifth and sixth causes of action under the ADA, but argues that he has established a prima facie case for disability discrimination under the Rehabilitation Act. The plaintiff therefore requests that his fifth cause of action be construed under the Rehabilitation Act. The defendant does not object. The plaintiff's sixth cause of action is therefore dismissed, and the Court will construe the plaintiff's fifth cause of action as alleging a claim of discrimination under the Rehabilitation Act.

■ To establish a prima facie case of discrimination under the Rehabilitation Act, the plaintiff must demonstrate that: (1) the employer is subject to the Rehabilitation Act; (2) the plaintiff is a disabled person as defined by the Rehabilitation Act; (3) the plaintiff is "otherwise qualified"—that is, he could perform the essential functions of his job with or without reasonable accommodation; and (4) the plaintiff suffered an adverse employment action because of his disability. *Kinsella v. Rumsfeld*, 320 F.3d 309, 314 (2d Cir. 2003); *Weixel v. Bd. of Educ. of New York*, 287 F.3d 138, 147 (2d Cir.2002). The defendant argues that the plaintiff is not

---

**1.** As explained below, although the plaintiff alleged his fifth and sixth causes of action under the ADA, the plaintiff withdrew those causes of action, and the parties agreed that the plaintiff's fifth cause of action should now be construed as asserted under the Rehabilitation Act.

"disabled" as defined by the Rehabilitation Act and that, in any event, the defendant has accommodated the plaintiff's disability in accordance with the Rehabilitation Act.

### 2.

█ The Rehabilitation Act defines an individual with a disability as "any person who—(i) has a physical or mental impairment which substantially limits one or more of such person's major life activities; (ii) has a record of such an impairment; or (iii) is regarded as having such an impairment." 29 U.S.C. § 705(20)(B). This definition is almost identical to that of a disabled person under the ADA. *See* 42 U.S.C. § 12102(2). Therefore, in determining whether the plaintiff falls within this definition, cases that interpret the definition of a disabled person under the ADA are instructive. *See Weixel,* 287 F.3d at 146–48 (using same analysis to determine whether plaintiff was disabled within meaning of both ADA and Rehabilitation Act).

█ The plaintiff argues that he has a physical impairment that substantially limits a major life activity. To establish such an impairment, the plaintiff must show (1) the presence of a mental of physical impairment, (2) that the impairment affects a "major life activity," and (3) that the impairment "substantially limits" this major life activity. *Toyota Motor Mfg. v. Williams,* 534 U.S. 184, 194–95, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002); *Colwell v. Suffolk County Police Dep't,* 158 F.3d 635, 641 (2d Cir.1998); *Weixel,* 287 F.3d at 147; *Stalter v. Bd. of Cooperative Educ. Servs. of Rockland County,* 235 F.Supp.2d 323, 329 (S.D.N.Y.2002). The plaintiff argues that his leg ulcers and varicose veins constitute a physical impairment that substantially limits his ability to walk, a major life activity. *See Toyota Motor,* 534 U.S. at 197, 122 S.Ct. 681 (including walking in list of "major life activities" for purposes of

determining whether plaintiff was disabled). For the purposes of this motion, the defendant does not dispute that the plaintiff has a physical impairment, that walking is a "major life activity" within the meaning of the Rehabilitation Act, or that this physical impairment may impair the plaintiff's ability to walk. Therefore, the issue is whether the plaintiff's physical impairment "substantially limits" the plaintiff's ability to walk within the meaning of the Rehabilitation Act.

█ Because the Rehabilitation Act regulations provide no guidance as to what constitutes a "substantial limitation," Second Circuit courts have looked to EEOC regulations implementing the ADA, which define the term to mean: "(i) Unable to perform a major life activity that the average person in the general population can perform; or (ii) Significantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." *See Colwell,* 158 F.3d at 643 (citing 29 C.F.R. § 1630.2(j)(1)). Whether a physical impairment substantially limits a major life activity is an "individualized and fact-specific" inquiry. *Id.* at 643.

The plaintiff does not fall into either of the two categories listed in the EEOC regulations. The plaintiff alleges that his physical condition causes severe pain and swelling in his legs and feet and that, because of this pain, his doctors advise him against walking for more than eight hours each day. (Garvin Aff., ¶ 7; Notes from Henry A. Greenblatt, M.D. ("Physician's Notes"), attached as Ex. B to Opp. Mem.) The plaintiff also alleges that this pain caused him to work slowly on his route. (Garvin Aff., ¶ 4.) However, conditions that do not limit the plaintiff from walking eight hours a day in the demanding occu-

pation of a postal route carrier do not arise to the level of a substantial limitation on the major life activity of walking. Courts in this district have repeatedly held that the need to walk slowly and the inability to walk long distances or for long periods of time—much less than the plaintiff can walk—do not constitute substantial limits on walking. *See, e.g., Mitchell v. Girl Scouts of the U.S.A.*, No. 98 Civ. 3730, 2003 WL 22705121, at *6 (S.D.N.Y. Nov.17, 2003) (finding that inability to do a "substantial amount of walking ... while of course to an extent is limiting, does not rise to the level of a substantial limitation"); *Rosa v. Brink's, Inc.*, 103 F.Supp.2d 287, 290 (S.D.N.Y.2000) (finding inability to walk for long period of time does not amount to substantial limitation); *Butterfield v. New York State*, No. 96 Civ. 5144, 1998 WL 401533, at *9 (S.D.N.Y. July 15, 1998) (finding plaintiff's trouble taking extended walks "simply does not, as a matter of law, constitute a sufficiently substantial limitation to allow his case to go to the jury on this point"); *Hazeldine v. Beverage Media, Ltd.*, 954 F.Supp. 697, 703–04 (S.D.N.Y.1997) (finding plaintiff's inability to walk more than five city blocks without resting did not support conclusion that her weight substantially limited major life activity). Courts in other Circuits have reached similar conclusions. *See, e.g., Kelly v. Drexel Univ.*, 94 F.3d 102, 106 (3d Cir.1996) (affirming district court's holding that plaintiff's inability to walk more than one mile, inability to jog, and need to move slowly and hold handrail when climbing stairs did not, as a matter of law, substantially limit his ability to walk); *Graver v. Nat'l Eng'g Co.*, No. 94–C–1228, 1995 WL 443944, at *10–11 (N.D.Ill. July 25, 1995)

(finding plaintiff's limp and pain while walking did not constitute disability); *Stone v. Entergy Servs., Inc.*, No. 94–2669, 1995 WL 368473, at *4 (E.D.La. June 20, 1995) (finding plaintiff's inability to walk briskly or climb stairs not substantial limitation on major life activity).

The plaintiff's inability to walk quickly or to walk for over eight hours is therefore not a substantial limitation on a major life activity. Because the plaintiff does not fall within the meaning of a "disabled person" as defined by the Rehabilitation Act, summary judgment is granted in favor of the defendant with respect to the plaintiff's fifth cause of action.

3.

To the extent that the plaintiff alleges in his fifth cause of action that the defendant is liable for failure to accommodate his alleged disability, summary judgment in favor of the defendant is also appropriate because the defendant reasonably accommodated the plaintiff's alleged disability as required by the Rehabilitation Act.

The Rehabilitation Act requires an employer to provide reasonable accommodations for qualified employees with a disability. 29 U.S.C. § 794(d), incorporating by reference 42 U.S.C. § 12112(b)(5)(A). *See Stone v. City of Mount Vernon*, 118 F.3d 92, 96–97 (2d Cir.1997). In his opposition papers on the current motion, the plaintiff alleges that the defendant failed to reasonably accommodate the plaintiff because the defendant did not permit the plaintiff to wear soft shoes and because the defendant repeatedly requested that the plaintiff work overtime.

The defendant's failure to permit the plaintiff to wear slippers [2] on the work

---

**2.** Although the plaintiff alleges in his affidavit dated September 13, 2004 that he was sent home from work on October 28, 1999, for wearing sneakers, in his previous deposition testimony the plaintiff stated that he was, in

fact, wearing slippers at the time of the incident. (Garvin Mar. Dep. at 33–34, 55–56.) It is well settled that an affidavit submitted by a party in response to a motion for summary judgment must be disregarded to the extent

floor of the postal station does not constitute a failure to accommodate under the Rehabilitation Act. The plaintiff admits that wearing slippers on the work floor posed a safety hazard. (Garvin Mar. Dep. at 57.) An employer is not required to make an accommodation that would pose safety risks. *See DiPompo v. West Point Military Academy*, 770 F.Supp. 887, 893–94 (S.D.N.Y.1991) (finding request by firefighter to eliminate training requirements that involved substantial reading would pose "obvious and unacceptable safety risks" and thus was not required under Rehabilitation Act), *aff'd*, 960 F.2d 326 (2d Cir.1992). Thus the defendant's refusal to make this accommodation was not unreasonable under the Rehabilitation Act.

The defendant's repeated inquiries into the plaintiff's ability to work overtime also did not constitute a failure to accommodate the plaintiff's alleged disability. The defendant never required the plaintiff to work overtime from 1984 until the plaintiff's retirement. (Garvin Feb. Dep., at 90–91; Garvin Aug. Dep. at 374–75.) *Cf. Durant v. Nynex*, 101 F.Supp.2d 227, 232 (S.D.N.Y.2000) (granting summary judgment for defendants in religious discrimination case where plaintiff alleged she was offered overtime work "solely to antagonize her" because of her protected status, because defendant had reasonably accommodated plaintiff by not requiring her to work overtime).

### 4.

Summary judgment is also appropriate with regard to the plaintiff's fifth cause of action because the plaintiff has presented no evidence that the defendant took any adverse action against the plaintiff because of his disability.

To establish that an employer's conduct constituted an adverse employment action, a plaintiff must provide evidence that the conduct resulted in "a materially adverse change in the terms and conditions of employment." *Torres v. Pisano*, 116 F.3d 625, 640 (2d Cir.1997). Such a materially adverse change must be "more disruptive than mere inconvenience or an alteration of job responsibilities," and can include, for example, "termination of employment, a demotion accompanied by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir.2000) (internal citations omitted). In his opposition papers on the current motion, the plaintiff identifies only two alleged adverse employment actions—the failure to allow the plaintiff to wear soft shoes and the repeated requests of the plaintiff to work overtime.

Neither of these actions constitutes an adverse employment action. As explained above, the plaintiff admits that wearing slippers on the work floor posed a safety hazard. (Garvin Mar. Dep. at 57.) A requirement that an employee conform to the safety requirements of a work place does not constitute a material adverse change in the plaintiff's employment. Moreover, the plaintiff did wear slippers on other occasions without being disciplined. (Garvin Mar. Dep. at 55–56.) Furthermore, inquiring if the plaintiff can work overtime does not constitute an adverse employment action, particularly when the plaintiff was never required to work overtime or penalized for not working overtime. (Garvin Mar. Dep., at 90–

that it contradicts that party's prior deposition testimony. *Mack v. United States*, 814 F.2d 120, 124 (2d Cir.1987); *Reisner v. General Motors Corp.*, 671 F.2d 91, 93 (2d Cir.

1982). The plaintiff also testified at his deposition that he wore slippers on other occasions and was not disciplined for doing so. (Garvin Mar. Dep. at 55–56.).

91, 374–75.) Therefore, the plaintiff's fifth cause of action must be dismissed.

## C.

Summary judgment should also be granted dismissing the plaintiff's claim of religious discrimination under Title VII because the plaintiff has not provided sufficient evidence of an adverse employment action under circumstances that give rise to an inference of unlawful discrimination.

To establish a prima facie case of religious discrimination, a plaintiff must show that: (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for his position; (3) the plaintiff suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances that give rise to an inference of discrimination. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See also Fitzgerald v. Henderson,* 251 F.3d 345, 356 (2d Cir. 2001); *Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 (2d Cir.2000), *cert. denied,* 540 U.S. 811, 124 S.Ct. 53, 157 L.Ed.2d 24 (2003); *O'Dwyer v. Snow,* No. 00 Civ. 8918, 2004 WL 444534, at *9 (S.D.N.Y. Mar.10, 2004). The plaintiff alleges, and the defendant does not dispute, that he was a member of a protected class as a practicing Jew and that he was qualified for his position as evidenced by his employment of thirty-five years. (Opp. Mem. at 9–10.) Therefore, the issue is whether the plaintiff has provided evidence of an adverse employment action and if it occurred under circumstances that give rise to an inference of discrimination.

As described above, to establish an adverse employment action a plaintiff must provide evidence that the employer's conduct resulted in "a materially adverse change in the terms and conditions of employment." *Torres,* 116 F.3d at 640. A adverse change must be "more disruptive than mere inconvenience or an alteration of job responsibilities," and can include, for example, "termination of employment, a demotion accompanied by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Galabya,* 202 F.3d at 640 (internal citations omitted).

### 1.

The plaintiff alleges that he was subject to adverse employment actions that give rise to an inference of discrimination because he was subjected to repeated requests to work overtime and on Saturdays, his supervisors arranged for mail to go undelivered on Saturdays so that he would have excessive amounts to deliver on Mondays, and he was subjected to numerous disciplinary actions. (Opp. Mem. at 10–12.)

■■■■■ The defendant's requests for the plaintiff to work on Saturdays or overtime do not constitute an adverse employment action. Although the defendant often asked the plaintiff if he could work on Saturdays, the plaintiff's supervisors never required him to work on a Saturday or a Jewish holiday, and he never was disciplined or lost pay as a result of not working on Saturdays or other Jewish holidays. (Garvin Aug. Dep. at 224, 249.) The requests to work overtime or work during holidays that the plaintiff freely turned down were, at most, inconveniences for the plaintiff rather than a material adverse change in the terms and conditions of employment.[3]

---

**3.** Similarly, the defendant's responses to the plaintiff's requests for time off during Jewish holidays do not constitute an adverse employment action. The requirement that the plaintiff provide proof of Jewish holidays by bringing in a calendar did not create a material adverse change in the plaintiff's terms and conditions of employment. The plaintiff's al-

█ The plaintiff's allegation that his supervisors ensured that the plaintiff would have a higher quantity of mail on Mondays by instructing carriers to deliver only part of the mail on the plaintiff's route on Saturdays does not provide evidence of an adverse employment action that gives rise to an inference of discrimination. Although there is evidence that, on one occasion, Raciti discovered that a supervisor was not delivering the mail on several routes, this problem was not limited to the plaintiff's route and Raciti subsequently demoted the supervisor, correcting the problem. (Raciti Dep. at 22, 29–30.) The plaintiff provides no evidence that on any other occasion his supervisors curtailed mail delivery on the plaintiff's route on a Saturday, and no evidence that they did so with any discriminatory purpose. At oral argument, counsel for the plaintiff conceded that there is no evidence to support the plaintiff's contention that any supervisor told anyone not to deliver mail on Saturdays on the plaintiff's route, and the plaintiff does not rely on the increased mail on Mondays as evidence of an adverse employment action. (Transcript of oral argument held Mar. 22, 2005 ("Tr."), at 17–

18.) There is therefore no evidence of a discriminatory adverse action taken with regard to the delivery of the plaintiff's mail on Saturdays. *See Baker v. Latham Sparrowbush Assocs.*, 72 F.3d 246, 255 (2d Cir. 1995) (finding that allegation on information and belief without supporting evidence should play no role in summary judgment proceedings).

█ The plaintiff has also failed to provide evidence that any of the plaintiff's suspensions were caused by religious discrimination. The plaintiff provides no evidence of how any specific disciplinary measures were taken by specific actors in a way from which religious discrimination could be inferred. None of the suspensions were for failing to work on Saturdays or religious holidays. Each of the disciplines was for a reason, such as failure to follow instructions, that was unrelated to the failure to work on Saturdays or Jewish holidays.[4] Of the seven suspensions issued to the plaintiff between October 1998 and June 2000, only three suspensions remained on his record, and only one of these was actually served. (Brackney Decl., Exs. K, M, P, R, S, T, X, Z, AA, AC,

legations that such requests often were not returned within 72 hours as required ignores that such requests were approved automatically if not denied within 72 hours (Raciti Dep. at 54–58), and that the requests were in fact granted and the plaintiff was never disciplined or denied pay as a result of taking off any Jewish holiday. (Garvin Aug. Dep. at 224, 249.) To the extent that the plaintiff argues that the defendant failed to accommodate his disability because the defendant was discriminating against him based on his religion, these allegations are without merit. For the reasons stated above, there is no evidence that the defendant failed to accommodate plaintiff's physical impairment. Moreover, there is no evidence linking any alleged failure to accommodate the defendant's physical impairment to religious discrimination.

4. Similarly, to the extent that the plaintiff argues that the defendant failed to accommo-

date him as required by § 701(j) of Title VII, this claim is without merit. *See* 42 U.S.C. § 2000e(j). In order to establish a prima facie case for failure to accommodate the plaintiff's religious beliefs in violation of Title VII, the plaintiff must establish that: 1) the plaintiff held a bona fide religious belief conflicting with an employment requirement; 2) the plaintiff informed the employer of this belief; and 3) the plaintiff was disciplined for the plaintiff's failure to comply with the conflicting employment requirement. *See Cosme v. Henderson*, 287 F.3d 152, 158 (2d Cir. 2002). Here, the plaintiff was not required to work on Saturdays or Jewish holidays, and the plaintiff provides no evidence of any disciplinary measure taken against him that was related to the plaintiff's failure to work on Saturdays or Jewish holidays. Therefore, the plaintiff has not established a prima facie case that the defendant failed to accommodate his religious beliefs in violation of Title VII.

AD, AE.) All three suspensions were issued by Molia. (Brackney Decl., Exs. S, AA, AD.) The plaintiff has provided no evidence that would show that these suspensions were caused by religious discrimination; in fact, the plaintiff stated in his February 2002 deposition testimony that Molia had never made any comments about his religion.[5] (Garvin Feb. Dep. at 124.) The plaintiff stated that he felt that Molia took the disciplinary actions against him only because he was under orders from Raciti to do so, but he provides no facts to support this assertion. (*Id.* at 123–24.) The plaintiff's suspicions of discrimination in the absence of any supporting evidence cannot defeat a motion for summary judgment. *See Baker,* 72 F.3d at 255; *see also Kalsi v. New York City Transit Auth.,* 62 F.Supp.2d 745, 753–54 (E.D.N.Y.1998) (dismissing case where plaintiff provided no evidence suggesting termination motivated by discriminatory animus), *aff'd,* 189 F.3d 461 (2d Cir.1999) (TABLE).

### 2.

■■■■ The plaintiff also alleges that, even if there were no acts that individually constituted an adverse discriminatory employment action, the overall harassment to which he was subjected produced a hostile work environment, which can constitute an adverse employment action. *See National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 115–16, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002); *Richardson v. New York State Dep't of Corr. Serv.,* 180 F.3d

426, 446 (2d Cir.1999). To establish a prima facie case of hostile work environment, a plaintiff must show that: (1) the harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," and (2) a specific basis exists for imputing the objectionable conduct to the employer. *Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 149 (2d Cir.1997). The first element of the prima facie case must be established by a showing that "the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of [the plaintiff's] employment were thereby altered." *Alfano v. Costello,* 294 F.3d 365, 373 (2d Cir.2002). "The incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief." *Kotcher v. Rosa and Sullivan Appliance Ctr.,* 957 F.2d 59, 62 (2d Cir.1992); *Richardson,* 180 F.3d at 437.

■■■■ The crux of the plaintiff's hostile work environment claim is the plaintiff's allegation that his supervisors created a hostile work environment by repeatedly commenting on the fact that he did not work on Saturdays. The plaintiff alleges that in November 1998 Raciti asked him why he could not work on Saturdays after he attended synagogue services, but Raciti made no comments about the plaintiff's religion after the plaintiff explained his observance of the Sabbath. (Garvin Aug. Dep. at 228–29.) The plaintiff also contends that Simon remarked that the plain-

---

5. In his affidavit dated September 13, 2004, the plaintiff alleges that, on Mondays in 1998–2000, when he made complaints about his mail volume, Molia repeatedly told him, "If you want your route cleaned up on Saturday, come to work after your synagogue." (Garvin Aff., ¶ 6.) However, in his previous deposition testimony of February 20, 2003, the plaintiff stated that Molia had never made any comments regarding his religion. An affida-

vit submitted by a party in response to a motion for summary judgment must be disregarded to the extent that it contradicts that party's prior deposition testimony. *Mack,* 814 F.2d at 124; *Reisner,* 671 F.2d at 93. Therefore, for the purposes of this motion, the Court disregards the plaintiff's subsequent contention that Molia commented on the plaintiff's observance of the Sabbath.

tiff should work on Saturdays if he found that he had too much mail to deliver on Mondays and that Dennis told the plaintiff that he was not flexible enough with his religion and that she thought he was being disciplined because of religious discrimination. (Garvin Feb. Dep. at 47–49; Garvin Aug. Dep. at 238, 252–53.)[6] The plaintiff alleges that Simon and Raciti repeatedly asked the plaintiff if he could come in on Saturdays, forcing him to explain repeatedly that he could not. (Garvin Aff., ¶ 6.) The plaintiff alleges that Williams, who allegedly claimed to have "ties to Zionism," made approximately six remarks to the plaintiff about the plaintiff's inability to work on Saturdays, including an incident in which he asked the plaintiff why he could not get a "pardon" from his Rabbi so that the plaintiff could work on Saturdays. (Garvin Feb. Dep. at 79–92, 85, 91; Garvin Aug. Dep. at 333, Garvin Mar. Dep. at 73.)

These incidents do not meet the standard for establishing a prima facie case of a hostile work environment. The remarks, although insensitive and offensive, were not so severe, pervasive, and insulting as to constitute an objectively hostile work environment. *See, e.g., Alfano,* 294 F.3d at 376–81; *Shabat v. Blue Cross Blue Shield,* 925 F.Supp. 977, 982 (W.D.N.Y. 1996), *aff'd,* 108 F.3d 1370 (2d Cir.1997).

While the remarks that the plaintiff alleges that Rosario made as threats were insensitive, they are also insufficient to support a claim of religious discrimination based on a hostile work environment. Rosario's alleged May 15, 1997, remark that he would "put his foot up [the plaintiff's] ass," and his alleged remark that he would break the plaintiff's thumb if the plaintiff "stuck out like a sore thumb" (Garvin Aff., ¶ 11; Garvin Feb. Dep. at 44–45, 164–65), are isolated incidents without any refer-

ence to hostility based on religion. *See Alfano,* 294 F.3d at 377 (discounting incidents unrelated to alleged basis for discriminatory hostile environment); *Kotcher,* 957 F.2d at 62; *Richardson,* 180 F.3d at 437. The remarks were neutral on their face with respect to the plaintiff's religion. Moreover, the plaintiff has provided no evidence linking the remarks to animosity toward the plaintiff because of his religion. The plaintiff stated that Rosario never made any comment regarding the plaintiff's religion. (Garvin Mar. Dep. at 265–69.) The plaintiff's suspicions of religious discrimination as a motive cannot alone defeat summary judgment. *See Baker,* 72 F.3d at 255; *see also Kalsi,* 62 F.Supp.2d at 753. The plaintiff, in fact, suggests that Rosario had another motive for the alleged comments, claiming that Rosario disliked the plaintiff because Rosario believed the plaintiff commented to the press about an alleged impropriety by Rosario. (*Id.* at 66–67.)

The plaintiff has failed to provide any evidence to support his allegations that he was subject to a hostile work environment because he was given extra mail on Saturdays, his mail was undercounted, and he was denied assistance in delivering the mail. First, for the reasons explained above, there is no evidence that the plaintiff's supervisors took measures to ensure that the plaintiff had a heavier volume of mail than other carriers on Mondays, and there is no evidence of any religiously discriminatory animus in the actions of his supervisors in connection with the volume of Monday mail, as the plaintiff's counsel conceded. (Tr. at 18.) Second, the plaintiff has provided no evidence that his mail was not counted properly or that the counting was affected by religious animosi-

---

**6.** The October 1998 discipline about which the plaintiff testified, and which was ostensibly based on allegedly delaying the mail, was eventually reduced to a letter of warning and ultimately expunged after arbitration. (Brackney Decl., Exs. E K, M.)

ty. Furthermore, because the plaintiff faced no consequences when he could not complete his delivery without assistance, the plaintiff cannot establish that the denial of assistance was "sufficiently severe or pervasive to alter the conditions of the [plaintiff's] employment," as required to establish a prima facie case of a hostile work environment. *See Perry*, 115 F.3d at 149.[7]

The plaintiff's claims that he was subject to harassment at work by being forced to abide by workplace rules also fail to establish a prima facie case for a religiously hostile work environment. The plaintiff alleges that his supervisors did not allow him to use his mobile phone at work, would not allow him to wear his slippers at work, told him not to use his car to deliver mail, and would not allow him to buy stamps behind the counter instead of waiting in line. (Garvin Feb. Dep. at 117, 137–38, 150–51 Garvin Mar. Dep. at 345.) The plaintiff concedes, however, that all of these actions were prohibited by USPS regulations, arguing only that he was singled out for enforcement of the rules. (Garvin Feb. Dep. at 117–18, 122–23, 138, 140–41, 150; Garvin Mar. Dep. at 338–40.) A handful of situations in which the plaintiff was required to abide by the workplaces regulations, does not, however, constitute harassment "sufficiently severe or pervasive to alter the conditions of the victim's employment," nor does it constitute an "abusive working environment" as required to create a prima facie case for a hostile working environment. *Perry*, 115

F.3d at 149. There is also no evidence linking these facially neutral actions to a religiously hostile working environment.

The plaintiff's claim that the defendant failed to investigate the plaintiff's complaints regarding the postal patron Asher also fails to support his hostile work environment claim. The plaintiff offers no evidence of such a failure. Indeed, the evidence shows that that the plaintiff's conflict with Asher was, in fact, investigated. The plaintiff alleges that the Postal Inspectors that investigated the situation were discriminating against him by following him on his route and observing him in Asher's building. (Garvin Feb. Dep. at 194–95.) He also alleges that he was discriminated against when Asher's residence was removed from his route due to the conflict between the plaintiff and Asher. (Garvin Aug. Dep. at 312–14; Garvin Mar. Dep. at 90–93; Brackney Decl. at Ex. AG.) The plaintiff alleges that the investigation was discriminatory because the investigators sided with Asher and because the investigators were under orders from Rosario to discriminate against the plaintiff. (Garvin Feb. Dep. at 185–86, 191.) The plaintiff, however, offers no evidence that these measures were discriminatory or that Rosario took them out of any religious hostility. There is no evidence to suggest that that the investigation and subsequent measures were motivated by anything other than an attempt to protect the plaintiff by eliminating contact between Asher and the plaintiff, particularly when previous

---

7. The plaintiff's claims that he was harassed for taking sick leave, that he was required to bring in a calendar to prove the dates of Jewish holidays, and that his requests for sick leave were not confirmed in a timely fashion also do not provide evidence of a hostile work environment. While USPS regulations did not obligate the plaintiff's supervisors to demand documentation for sick leave that amounted to fewer than three days, the regu-

lations allowed the plaintiff's supervisors to require such documentation at their discretion. (Brackney, Ex. G). Moreover, the plaintiff's requests for vacation and sick leave were, in fact, granted and the plaintiff was never disciplined or denied pay as a result of taking sick leave or taking off for a Jewish holiday. (Garvin Feb. Dep. at 76, 84, 142; Garvin Aug. Dep. at 224, 249.)

contact had resulted in physical violence. (Garvin Feb. Dep. at 32; Garvin Mar. Dep. at 85–89.)

Finally, the plaintiff's allegation that Rosario conspired with Asher to force the plaintiff from his job (Garvin Aff., ¶ 12; Garvin Feb. Dep. at 33–37; Garvin Aug. Dep. at 297, 377; Garvin Mar. Dep. at 97) is unsupported by any evidence. The plaintiff claims that he was disciplined as a result of a complaint made by Asher, and points to one discipline that arose after an anonymous complaint was made from Asher's address. (Garvin Feb. Dep. at 38–40; Garvin Aug. Dep. at 221.) [8] The plaintiff provides no evidence that Rosario conspired with Asher to make the complaint. Without any facts to support this claim, it cannot establish a prima facie case for a hostile working environment. *See Baker*, 72 F.3d at 255; *see also Kalsi*, 62 F.Supp.2d at 753.

For the reasons stated above, summary judgment is granted dismissing the plaintiff's fifteenth cause of action, which alleges religious discrimination under Title VII.

### D.

 Summary judgment is also warranted to dismiss the plaintiff's claim of constructive discharge because the plaintiff has provided no evidence that he was forced to resign. To establish a claim of constructive discharge, a plaintiff must show that the defendant "deliberately made his working conditions so intolerable that he was forced into an involuntary resignation." *Stetson v. NYNEX Service Co.*, 995 F.2d 355, 360–61 (2d Cir.1993) (internal citation and quotation marks omitted); *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir.1983). Here, the plaintiff argues that he was compelled to resign because he was the subject of an inordinate amount of disciplinary action, which made him reasonably believe that he would be terminated and lose his pension. (Opp. Mem. at 20.) The plaintiff has testified, however, that he retired because he was afraid that he might be convicted in a pending criminal trial and therefore lose his pension. (Garvin Feb. Dep. at 100; Garvin Mar. Dep. at 377–79.) The plaintiff has testified that his criminal prosecution was scheduled to conclude on February 25, 2000, and so he requested that the USPS permit him to retire on February 22, 2000, so that he could retain his pension. (Garvin Mar. Dep. at 378–79.) Because the plaintiff has testified that his retirement was due to these concerns, rather than the defendant's making his working conditions intolerable, no reasonable jury could conclude that the defendant was constructively discharged. Moreover, for the reasons explained above, the plaintiff has failed to present evidence from which a reasonable jury could conclude that the incidents the plaintiff contends formed the basis for his constructive discharge were so intolerable as to force his resignation or were caused by religious discrimination or discrimination based on disability.

### E.

Summary judgment, however, cannot be granted with respect to the plaintiff's twelfth cause of action for retaliation under Title VII.

---

**8.** On June 24, 1999 the plaintiff received a notice of removal for failure to place the mail in mail receptacles. (Brackney Decl., Ex. S; Garvin Feb. Dep. at 38–40.) On June 17, 1999, Molia had received an anonymous call from a postal patron alleging that the plaintiff had failed to place the mail in mail receptacles. (Garvin Feb. Dep. at 38–40; Brackney Decl., Ex. S.) The defendant alleges that Molia investigated and discovered that the mail was indeed outside the receptacles. (Brackney Decl., Ex. S.) The notice of removal was subsequently reduced to a seven-day suspension. (Brackney Decl., Ex. T.)

 To establish a prima facie case for retaliation, the plaintiff must show that: (1) he was engaged in a protected activity; (2) the employer was aware of that activity; (3) the employer took an adverse employment action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. *See Sarno v. Douglas–Elliman,* 183 F.3d 155, 159 (2d Cir.1999); *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1308 (2d Cir.1995); *Kotcher,* 957 F.2d at 64. The plaintiff alleges, and the defendant does not dispute, that the plaintiff engaged in protected activity by filing EEOC complaints on May 15, 1997 and November 11, 1997, and that the defendant was aware of these actions. (Garvin Feb. Dep. at 101, 157–60, 177.) Those complaints alleged religious discrimination and retaliation by Rosario against the plaintiff. (Brackney Decl., Exs. AH, AI.) The defendant does dispute that the plaintiff can establish the third and fourth steps of a prima facie case of retaliation.

The plaintiff claims that the defendant took several adverse employment actions against him. The plaintiff claims that these adverse employment actions consisted of supervisors and managers issuing disciplinary actions, making comments about his religion and inability to work on Saturdays, failing to investigate his complaints about Asher, forcing him to bring in Jewish calendars to prove Jewish holidays, delaying his requests for time off for the Jewish holidays, and not providing assistance on his route. (Opp. Mem. at 18.) As explained above, the plaintiff's allegations that his supervisors and managers made comments about his religion and inability to work on Saturdays, forced him to prove the dates of holidays, delayed his requests for time off, and failed to provide assistance on his route do not constitute adverse employment actions, and there are no facts to support the conclusion that the defendant failed to investigate the plaintiff's complaints concerning Asher.

The plaintiff was disciplined eleven times between October 1998 and June 2000. The plaintiff filed grievances against all but one of these disciplinary actions and, of the ten disciplinary actions that the plaintiff disputed, nine were eventually rescinded, cancelled, expunged, or reduced. (Brackney Decl., Exs. I, K, M, P, R, T, V, X, Z, AC.) Only one of the disciplinary actions against which the plaintiff filed a grievance was sustained in its entirety. (Brackney Decl., Ex. AE.) The defendant argues that the disciplinary measures that were subsequently rescinded, cancelled, or expunged cannot individually be considered adverse employment actions. *See Yerdon v. Henry,* 91 F.3d 370, 378 (2d Cir.1996) (affirming district court finding that filing of internal union charges against plaintiff did not constitute adverse employment action if charges were ultimately dismissed); *Washington v. County of Rockland,* 211 F.Supp.2d 507, 514 (S.D.N.Y.2002) (finding disciplinary charges and formal hearings against plaintiffs insufficient to constitute adverse employment action to establish prima facie case for retaliation where charges against plaintiffs were dismissed after hearing and loss of pay was reinstated), *aff'd,* 373 F.3d 310 (2d Cir.2004); *Powell v. Consol. Edison Co. of New York, Inc.,* No. 97 Civ. 2439, 2001 WL 262583, at *8, n. 9 (S.D.N.Y. Mar. 13, 2001) (finding no adverse employment action where termination was reversed in subsequent union grievance proceeding and plaintiff was reinstated). The defendant also argues that it is doubtful whether the disciplinary actions that were not rescinded, canceled, or expunged but that did not rise to the level of a suspension could individually be considered adverse employment actions, since it is not clear that these measures entailed adverse consequences for the plaintiff.

*See, e.g., Shabat,* 925 F.Supp. at 989 (finding no adverse employment action where discipline was not accompanied by negative consequence such as demotion or denial of pay).

■ The defendant, however, has not established that the plaintiff cannot prove that the pattern of these disciplinary actions constituted an adverse employment action. Because there are no explicit rules for determining what constitutes an adverse employment action, "courts must pore over each case to determine whether the challenged employment action reaches the level of 'adverse.'" *Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 466 (2d Cir.1997) (citing *Welsh v. Derwinski,* 14 F.3d 85, 86 (1st Cir.1994).) The Court of Appeals for the Second Circuit has also stated that an employer's action that does not, standing alone, constitute an adverse employment action may nonetheless *"contribute* [ ] *to an atmosphere of adverse employment action"* when accompanied by other actions. *See Wanamaker,* 108 F.3d at 466 (citing *Collins v. State of Illinois,* 830 F.2d 692, 704 (7th Cir.1987)).

Here, the plaintiff was subjected to a pattern of disciplinary actions over a period of less than two years, several of which were subsequently found to be without merit, and almost all of which were subsequently found excessive. The plaintiff alleges, with some support, that the nature and frequency of the disciplines was "a little unusual." (Deposition of David Robinson, sworn to Mar. 17, 2004 ("Robinson Dep."), attached as Ex. C to Declaration of Danielle Gentin Stock Decl. dated Dec. 15, 2004 ("Stock Decl."), at 16.) Although several of these disciplinary measures individually might not comprise an adverse employment action, they contribute to establishing an adverse employment action in which the plaintiff was subjected to a pattern of letters of warning, suspensions, and notices of removal that were subsequently reduced or rescinded only after the plaintiff was forced to file grievances.

■ A causal connection may be established either directly, through evidence of retaliatory animus directed against the plaintiff by the defendant, or indirectly, by showing that the protected activity was followed closely by the adverse employment action. *See Johnson v. Palma,* 931 F.2d 203, 207 (2d Cir.1991) (citing *DeCintio v. Westchester County Medical Center,* 821 F.2d 111, 115 (2d Cir.1987).) The Second Circuit Court of Appeals has not provided a bright-line rule for how brief a period of time must exist between the protected activity and the adverse employment action in order for the plaintiff to show indirectly a causal connection. *See Gorman–Bakos v. Cornell Co-op Extension of Schenectady County,* 252 F.3d 545, 554 (2d Cir.2001) (stating that Court "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action" and outlining cases). Here, the eleven-month time period between the second EEOC complaint of November 1997 and the beginning of the pattern of disciplinary actions supports a finding that there is a genuine issue of material fact as to whether the actions were taken in retaliation for the plaintiff's protected conduct. *See DeCintio,* 821 F.2d at 115 (finding genuine issues of material fact precluded summary judgment where, among other factors, plaintiff was terminated "within one year" of filing civil action for discrimination under Title VII).

The inference of a causal relationship is also supported by the pattern of disciplines itself, nearly all of which were reduced or expunged, and by testimony of another employee that the disciplines were "a little unusual." (Robinson Dep. at 16.) While

the defendant defends the disciplines, there are sufficient issues of material fact with respect to causality to preclude summary judgment.

Therefore, the defendant's motion for summary judgment dismissing the plaintiff's twelfth cause of action for retaliation under Title VII is denied.

### F.

■ The plaintiff's sixteenth cause of action alleges that the defendant is liable for breach of contract. Specifically, the plaintiff alleges that the defendant breached the Connolly Agreement.

In late March and early April 1998, the plaintiff and others, including representatives of the USPS, signed the Connolly Agreement. (Connolly Agreement.) The Connolly Agreement stated, among other things, that all parties to the Agreement would treat each other with dignity and respect, and that the plaintiff would "be treated like all other employees at the Kingsbridge Station in every respect by all managers/supervisor [sic]." (*Id.*) The defendant claims that it is entitled to summary judgment on this breach of contract claim solely on the grounds that the plaintiff cannot prove that the Connolly Agreement was breached.

The defendant has not met his burden of showing that no genuine issue of material fact exists as to the plaintiff's breach of contract claim. The defendant argues that the Connolly Agreement did not give the plaintiff any rights beyond what federal law already guaranteed him. (Def. Mem. at 35.) Even if this is true, there is a genuine issue of material fact as to whether the plaintiff was the subject of retaliation under Title VII. If the plaintiff was the victim of retaliation, these actions may constitute a breach of the terms of the Connolly Agreement that the managers and supervisors treat the plaintiff "like all other employees at the Kingsbridge Sta-

tion in every respect...." (Connolly Agreement.) *Omni Quartz Ltd. v. CVS Corp.*, 287 F.3d 61, 65–66 (2d Cir.2002) (denying motion for summary judgment on contract claim where genuine issue of material fact existed as to whether defendant had in fact performed acts that would fulfill its obligation under contract).

Because a material issue of fact exists as to whether the defendant has breached the terms of the Connolly Agreement, summary judgment is denied as to the plaintiff's sixteenth cause of action.

### CONCLUSION

For the reasons stated above, summary judgment is granted dismissing all the plaintiff's causes of action except the twelfth cause of action for retaliation under Title VII and the plaintiff's sixteenth cause of action for breach of contract. The parties are directed to file a Joint Pre–Trial order within thirty days of the receipt of this Opinion and Order.

**SO ORDERED.**