**Khursheed SIDDIQI, Plaintiff,**

v.

**NEW YORK CITY HEALTH & HOSPITALS CORPORATION, Defendant.**

**No. 07 CV 2740(CM)(RLE).**

United States District Court, S.D. New York.

Aug. 12, 2008.

DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

McMAHON, District Judge.

Plaintiff Khursheed Siddiqi ("Siddiqi" or "plaintiff"), a senior medical technologist for the New York City Health & Hospitals Corporation ("AHHC") sued his employer for discrimination based on his race, age, religion, and national origin for various incidents that allegedly occurred during his employment at Bellevue Hospital Center ("Bellevue"). The complaint alleges that defendant (i) discriminated against plaintiff on account of his age, race, religion, and national origin in violation of Title VII, the Age Discrimination in Employment Act (AADEA), 42 U.S.C, § 1981, by, among other things, involuntarily transferring him from Lincoln Hospital Center ("Lincoln Hospital"), denying him a promotion, refusing to give him off days for religious holidays, giving him negative performance evaluations, and creating a hostile work environment; (ii) discriminated against plaintiff on account of his age, race, religion, and national origin in violation of the New York State Executive Law § 296 ("NYHRL"), and New York City Admin. Code § 8–107 et seq. by engaging in these same practices; (iii) forced plaintiff to work in a hostile work environment by harassing him and threatening his life; and (iv) retaliated against plaintiff in violation of Title VII by not promoting him and issuing him unfairly negative performance evaluations. HHC

has moved for summary judgment dismissing plaintiff's complaint. For the reasons set forth below, defendant's motion is granted in part and denied in part.

## BACKGROUND

Defendant set forth the facts in its Local Rule 56.1 Statement. Plaintiff did not comply with Local Civil Rule 56.1(b), which provides:

> The papers opposing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried.

Plaintiff does not reference Defendant's Rule 56.1 Statement and does not deny any of the allegations set forth in the statement. Rather, Plaintiff submits a statement of facts that generally reassert the allegations in the Complaint. Under Local Rule 56.1(c), "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed admitted unless controverted by the statement required to be served by the opposing party." Thus, all factual averments set forth in Defendant's Rule 56.1 Statement are deemed admitted. *See e.g. Global Vision Prods., Inc. v. Pfizer, Inc.*, 2006 WL 344757, 2006 U.S. Dist. LEXIS 6042 (S.D.N.Y.2006) (deeming all averments from defendant's Rule 56.1 Statement admitted when plaintiff fails to properly respond).

## A. The Parties

Plaintiff Khursheed Siddiqi is a male aged 63 (at the filing of this lawsuit in May 2007), of Asian race, Pakistani national origin, and Muslim religious faith. Plaintiff began working for HHC in 1974 as a Senior Medical Technologist. Plaintiff worked at Lincoln Hospital until he was transferred to Bellevue Hospital in July 1999, where he was an Associate Chemist Level 1 in the Department of Pathology. In 2003, Plaintiff transferred back to Lincoln Hospital.

Defendant New York City Health & Hospitals Corporation operates hospitals in New York City, including both Lincoln and Bellevue Hospitals.

Dr. Lawrence Kaplan ("Kaplan") was the Director of the Chemistry Laboratory during the relevant period.

Plaintiff reported directly to Laboratory Supervisor Yvette Vernon ("Vernon") during the relevant period. Vernon is a Christian, female over the age of 40.

Plaintiff also reported directly to Laboratory Supervisor, Charles Morant ("Morant") during the relevant period. Morant is an African American, Christian male, over the age of 40.

## B. The facts

### 1. Plaintiff's Discrimination Claims

Plaintiff claims that he suffered race, religious and/or national origin discrimination while employed by HHC. His complaint contains a list of incidents allegedly motivated by racial, national origin, and/or religious animus.

### A. Transfer to Bellevue

In July 1999, plaintiff was involuntarily transferred to Bellevue Hospital Center, allegedly in violation of the City Wide Labor Contracts and also in violation of the defendant's own Procedure and Manuals. (Compl.¶ 4.)

## B. Performance Evaluations

Plaintiff alleges that Morant and Vernon discriminated against him by giving him poor performance evaluations. During his time at Bellevue, Morant evaluated Plaintiff's technical performance and Vernon evaluated his attendance. Plaintiff received six evaluations while at Bellevue. His overall score was "satisfactory" three times and "needs improvement" three times.

On or about April 5, 2000, Plaintiff was given his performance evaluation for the period February 1999 through January 2000, his first performance evaluation while at Bellevue. Plaintiff was given an overall score of "needs improvement." (Pl.Ex. D. at 000012–15.) In explaining this summary ranking, Morant wrote:

> Based on a probationary status, a pattern of being absent on three Fridays in the rating period is cause for concern. Mr. Siddiqi has also been absent on at least one Monday during the rating period and has also taken unscheduled leave at least once. In addition, he has been late for his shift and did not document his lateness on the time sheet.

(*Id.* at 000014.) In explaining Plaintiff's "plan for improvement," Morant wrote:

> Continue rotational training on all instruments and procedures in chemistry department. Improve techniques on trouble shooting all instruments, and procedures. Particularly in the sample processing area. Attendance & punctuality must improve.

(*Id.* at 000015.) Vernon, who evaluated Plaintiff's attendance, noted Plaintiff was "absent due to sickness on three Fridays," absent due to sickness on a Monday, and took unscheduled leave on a Wednesday. (*Id.* at 000014.) Vernon noted that this is "cause for concern." (*Id.*)

For his next evaluation, for the period December 2000 through July 2000, Plaintiff received an overall score of "satisfactory." (*Id.* at 000019–22.) This score was followed with a caveat; Morant wrote that "Although a satisfactory rating has been given to Mr. Siddiqi, it is a borderline satisfactory and he must begin to show improvement before the next rating period." (*Id.* at 000021.) While Plaintiff's scores in each category were generally positive, Morant included several critical comments under the score. For example, Morant wrote that "Tech needs to more carefully follow SOP when reviewing and verifying urine tox results," and "Relations with other lab personnel are strained by Mr. Siddiqi's inability to take criticism or direction without getting very excited, defensive, and belligerent." (*Id.* at 000020.) The evaluation specifically noted that Plaintiff did not have excessive absences. (*Id.* at 000021.)

Although not specifically noted in the evaluation, Morant's negative comments may have been prompted by the fact that, on or about January 15, 2000, a Doctor Hoffman filed a complaint against Plaintiff after Plaintiff combined the test results from two patients' blood samples and incorrectly reported that one patient was pregnant. Plaintiff admitted to making the error, which he attributed to his stressful work environment. (Pl.Ex. E. at 000240–242.)

For his evaluation for the period July 2000 through July 2001, Plaintiff received a ranking of "needs improvement." (*Id.* at 000026–29.) In explaining the ranking, Morant wrote:

> Mr. Siddiqi was given a satisfactory rating on his previous evaluations. At that time, he was told that it was a borderline satisfactory and that he must show improvement. The quantity of work he performed is below average. A shift

change may be necessary in order to monitor his productivity.

(*Id.* at 000028.) Morant also noted that Plaintiff has excessive absences because he (a) was absent on five Fridays, (b) was absent after a scheduled day off on seven occasions, and (c) was sick on six occasions from January 2001 through June 2001. (*Id.*)

Following this evaluation, Plaintiff submitted a rebuttal. (*Id.* at 000034.) For example, in a section entitled "relations with patient/public," the evaluation stated that Plaintiff is "usually effective with co-workers and public occasionally has difficulty." (*Id.* at. 000027.) In his rebuttal, Plaintiff stated:

> In the short period of time after my transfer from Lincoln Hospital (7/6/99), I am proud of the cordial relationship I have developed with my colleagues. My particular job does not involve any contact with the public-at-large. My department has workers that succeed "behind the scenes" and help to make the Bellevue Hospital a top flight medical hospital. I question the veracity of the claim that I have "difficulty" dealing with the public.

(*Id.* at 000033–32.) In response to the criticisms about his absences, Plaintiff wrote:

> During 6 month period, I took only 2 sick leaves and others were documented sick leaves according to the union contract. As such these leaves should NOT be included (sic) my evaluation at all.

(*Id.* at 000033.)

In an evaluation for the three-month period ending October 2001, Plaintiff received an overall evaluation of "satisfactory." (*Id.* at 000036–39.) Morant wrote that "Tech need to more carefully lab (sic) SOP. Continue rotational assignment on all workstation in Chemistry department" and "work cooperatively with the workers on

the shift." (*Id.* at 000039). Plaintiff's attendance record was listed as "average." (*Id.* at 000038.) Plaintiff commented on the evaluation, asking for examples of occasions when he had not been cooperative, or did not follow the SOP. (*Id.*)

Plaintiff received a "needs improvement" for his next evaluation, for the year ending October 2002. (*Id.* at 000042–45.) In explaining this evaluation, Morant wrote:

> Tech has refused to respond and comply to written directives from the chief of service. Tech has failed to follow proper protocols in reporting and documenting critical values.

(*Id.* at 000044.) Vernon noted that Plaintiff requested sick leave on two occasions, both times before or after a paid leave day. (*Id.*) Plaintiff signed the evaluation, but stated that he did not agree with the assessment. (*Id.*)

Again, although not specifically discussed in the evaluation, Morant's comment that Plaintiff "failed to follow proper protocols in reporting and documenting critical values" likely referred, at least in part, to an instance that occurred on or about January 7, 2002. Plaintiff and another technician ran a test on a blood sample received from the emergency room. The test revealed that the patient had a "highly elevated" potassium level, which denoted kidney failure. In a memo to the associate director of the Department of Pathology, Dr. Kaplan wrote:

> Mr. Siddiqi [ ] decided that the result must not be real and chose not to report a critical potassium value to the physician and placed an "unable to perform" in the results ... It was not until 2202 hours that a critical potassium was finally entered in the electronic patient's records, although again the physician was not informed of the critical potassium

value. None of these critical potassium values were entered in the critical log book, nor was there any evidence that there was repeat analysis to confirm the second elevated potassium. This technologist just took it upon himself to totally ignore these results. When I asked Mr. Siddiqi for a written explanation for why he did not report the critical value, he waited for two days and then told his supervisor that he refused to comply with my direct request.

(Pl.Ex. H, Bates Stamp No. PER00376.)

Based on this incident, Plaintiff was served a "Notice and Statement of Charges" on June 10, 2002, for gross misconduct, poor work performance, and insubordination. (PL Ex. I.) At the end of Plaintiff's disciplinary conference, Plaintiff was informed that, while he subjectively believed he followed protocol in running the tests, he nonetheless failed "to complete the [reporting] process in its entirety and in a timely fashion." (Pl.Ex. J, Bates Stamp No. PER00285–88 at PER00286.) Plaintiff signed an agreement pleading "no contest" to the charges and accepted a two day unpaid suspension as punishment. (*Id.* at PER00288.)

Despite this potentially serious incident, Plaintiff felt the evaluation was unfairly negative, and for the first time indicated that discrimination was playing a role in his evaluations:

As in 2001, the evaluation that I have received for the year 2002 again indicates the malicious and discriminatory behavior of the evaluators within the Chemistry Department. The most blatant indication of their bias shows that the protocol they developed was the one I followed and was misunderstood by them .... The only conclusion I have is that my evaluation for 2002 is fully based on discrimination and is written

just to harass an elected union official and keep me silent.

(*Id.* at 000048.)

Plaintiff received higher scores on his next evaluation, for the quarter ending January 2003. (*Id.* at 000049–52.) Plaintiff received a rating of "satisfactory." Morant wrote:

We have pointed out a number of significant problems that Mr. Siddiqi has had last year. I have the impression that he has been trying hard to correct these deficiencies. We hope he continues his efforts. We hope he extends his efforts to correcting excessive absences.

(*Id.* at 000051.) However, the evaluation includes several critical comments; it states that Plaintiff did not follow protocol in reporting and documenting critical values, and noted excessive absences. (*Id.* at 000050–51.) The evaluation also noted that Plaintiff took sick leave after a paid leave day. (*Id.* at 000051.)

In another rebuttal, Plaintiff refuted these claims. This time, he accused Morant of ethnic discrimination:

I have been faithful employee of the city as a member of the hospital staff for the last 28 years. I have never disobeyed my superiors. However, in the past few years I have been subject to malicious conduct, which is exemplified by the false and baseless accusations contained in my most recent, 3 Month Evaluation. This above conduct by my superiors reflects a policy and pattern of harassment & bias against an employee of my ethnic background. If these practices continue, I will have no other choice but to seek the appropriate recourse.

(*Id.* at 000055.)

During his time at Bellevue, Plaintiff received numerous warnings about attendance issues. On April 4, 2000, Plaintiff received a memorandum from Vernon

about his absences, three of which were on Fridays. The memorandum stated:

> It is important that you make every effort to show improvement, as you will be required to submit documentation for any absence through October 31, 2000. If I do not see improvement, I will submit this information to Carole Braunstein for a formal counseling session. To avert such as situation, please make every effort to monitor your attendance.

(Pl.Ex. F at 000245.) Vernon sent Plaintiff a similar memorandum on April 18, 2003. (*Id.* at PER00261.) Vernon wrote that Plaintiff has "a pattern of absence before/after a paid leave day," and insisted on receiving documentation about future absences. (*Id.*)

Plaintiff transferred back to Lincoln in October 2003. (Siddiqi Aff. ¶ 33.) Thereafter, Plaintiff received evaluation scores of "outstanding" in his evaluation for the period of October 27, 2003 through January 27, 2004. (Def.Ex. Q.) Plaintiff received a score of "satisfactory plus" in his evaluation for the period of January 28, 2004 through July 1, 2004. (*Id.*) In his evaluation for the year ending July 1, 2007, the only comments on Plaintiff's evaluation were positive. Eskopan Ebose, Plaintiff's manager at Lincoln, wrote "Mr. Siddiqi is quite knowledgeable about his job responsibilities" and "Mr. Siddiqi consistently produces quality work in the year under review." (*Id.*) The comments were exactly the same for the evaluation for the year ending July 1, 2007. (*Id.*)

## C. Failure to Promote Claim

In his Complaint, Plaintiff alleges that he applied for an Associate Chemist Level III position in July 2002. (Compl.¶ 11.) Having received no response from management, he wrote a letter to Dr. Kaplan inquiring about his application. (*Id.* at

¶ 12.) Plaintiff was not invited for an interview. (Pl.Aff.¶ 17–18.)

Plaintiff alleges that the position was given to Morant, who is not Asian or Muslim, and whom Plaintiff says is less experienced than him, in March or April 2003. (Siddiqi Dep. at 126:20–128:1; Pl. Br. 4.) However, Defendant submits documents from Morant's personnel file showing that Morant was promoted to Chemist Level III on November 5, 2001, and held that title during the relevant period. (Pl.Ex.s M–N.)

The qualifications for a Level III position included (a) three years satisfactory full time experience in chemical work or (2) experience in the direction of all lab operations. (Pl.Ex. C, PER00005–07.) Defendant claims that Plaintiff was not qualified for a Level III position because Plaintiff did not have either supervisory experience or three years of satisfactory experience at Bellevue. (Pl.Ex. B at 50:15–17, Ex. D.)

## D. Failure to Allow Plaintiff to Take off Religious Holidays

While at Bellevue, Plaintiff made three requests to take off time for observing religious holidays, totaling five days. Plaintiff's request to take off December 6, 2002 was granted. Plaintiff's request to take off February 13 and February 14, 2003 was denied. Plaintiff's request to take off April 24 and April 25, 2003 for a religious holiday was also denied.

Plaintiff admits that the latter two requests were denied because Vernon was not able to find a substitute to cover Plaintiff's time off. (Siddiqi Dep. 104:23–24; see also Def's Rule 56.1 Statement ¶ 50.) Therefore, he has no claim for failure to accommodate. However, Plaintiff also claims that his requests for religious leave were denied at a higher rate than were requests made by employees who were not

Muslim or Asian. (Siddiqi Aff. ¶ 23.) This is a distinct form of discrimination.

## 2. Retaliation Claim

Plaintiff alleges that HHC declined to promote him, and issued him negative performance evaluations for the periods October 2001 through October 2002 and October 2002 through January 2003 in retaliation for his complaints about their discriminatory conduct.

As stated earlier, plaintiff wrote two rebuttals in response to negative performance evaluations he received—the first in response to the evaluation for the period of July 2001 through October 2001, and the second in response to the final evaluation for the period of October 2002 through January 2003. In both, he complained about discrimination.

Plaintiff testified that Dr. Kaplan threatened him after Plaintiff submitted a rebuttal to his performance evaluation, saying "Don't do rebuttal like that" and, "I will make your life miserable." (Siddiqi Dep. at 61:20–61:22.)

Plaintiff claims that his subsequent negative evaluations and the refusal to promote him to the Chemist III position in July 2002 were in retaliation for his first complaint about discrimination. Finally, Plaintiff claims that the disciplinary charges served on him in June 2002 were in retaliation for his complaint of discrimination.

## 3. Hostile Work Environment Claim

In support of his hostile work environment claim, Plaintiff points to several incidents involving Dr. Kaplan and Morant, as well as the conduct described above.

Plaintiff testified that Dr. Kaplan would put his finger in Plaintiff's face "every time when he came to talk" to Plaintiff, although he never said how many times that occurred. (Siddiqi Dep. At 52:3–52:4.) Plaintiff testified that, while putting his finger in Plaintiff's face, Dr. Kaplan would tell him "Either you listen to me what I'm saying, otherwise you will be in trouble. I will make your life miserable." (*Id.* at 52:7–52:9.) Plaintiff also testified that Dr. Kaplan "micromanaged" him. (*Id.* at 191:6–191:7.)

Plaintiff testified that Dr. Kaplan told him "You people don't know how to play baseball," and that he would make that comment to other "outside people" in the hospital. (*Id.* at 58:12–58:23.) Plaintiff admits that Dr. Kaplan was joking when he made the comment. (*Id.* at 59:1.)

Finally, Plaintiff testified that, on July 18, 2003, Morant physically intimidated and threatened him. Plaintiff claims that the incident began when Plaintiff and Morant were arguing about vacation time. (Siddiqi Dep. At 128:18–128:19.) Plaintiff stated:

> While [Vernon] was in her room I start talking to Mr. Morant about my vacation time. I applied two or three times. Every time he's refusing me or somebody taking it or somebody taking it. I said give me the opening space then, give me our date that nobody's applying so that I can apply for vacation and by the way, Mr. Charles Morant, you know we are, you are my member, I'm the chapter president, you are also my member and why you giving me a hard time, why you trying to give me a hard time. I'm your chapter president. You are under me, you're my member and you know that don't you remember that in 1987, Mr. Charles Morant, the same chapter person, same local 375 saved your life of your wrongdoing. He got mad. I just said what I've been doing. He know what happened in '87. I did not mention it. I told her who save your life, local 375 and the local chapter saved your life.

He said you are too much, you go very far, be careful.

(*Id.* at 128:18–129:6.)

According to Plaintiff, Morant threatened him by "jumping from his chair and come close to me to point out on my chin but I get separated from him and go over there, very far from him so that he cannot come near me." (*Id.* at 129:24–130:1.) According to Plaintiff, Vernon asked Morant to move away from Plaintiff. Plaintiff later reported the incident to the hospital administrator and to the police. After about a month, Associate Director of the Department of Pathology, Carol Braunstein, called Morant and three other people to meet about the incident. Braunstein determined that both Morant and Plaintiff were at fault. (*Id.* at 135:5–135:25.)

Plaintiff testified under oath that Morant did not threaten him because of his race, age, national origin, or religious faith. (*Id.* at 137:6–137:20.) Plaintiff testified that Morant threatened him because Plaintiff knew what Morant did in 1987, and for no other reason. (*Id.* at 137:3–137:6.)

## C. Procedural History

### 1. EEOC proceedings

On August 7, 2003, Plaintiff filed a charge of discrimination based on race, color, religion, and national origin, as well as a charge of retaliation, with the U.S. Equal Employment Opportunity Commission ("EEOC"). (Def Ex. A.) The charge states: "My supervisors have been continuolsy (sic) harrassing (sic) me, purporting false charges, distroting (sic) my annual evaluations and even verbally threatening me of my life." (*Id.*)

On January 9, 2007, the EEOC closed its file and issued a notice of right to sue. (*Id.*)

### 2. This action

On April 4, 2007, Plaintiff filed the complaint in this action. In his complaint, Plaintiff alleges that Defendant (i) discriminated against plaintiff on account of his age, race, religion, and national origin in violation of Title VII, the Age Discrimination in Employment Act ("ADEA"), 42 U.S.C. § 1981, by, among other things, involuntarily transferring him from Lincoln Hospital, denying him a promotion, refusing to give him off days for religious holidays, and giving him negative performance evaluations; (ii) discriminated against him on account of his age, race, religion, and national origin in violation of the NYHRL and the New York City Admin. Code § 8–107 et seq. by engaging in these same practices; (iii) forced him to work in a hostile work environment by harassing and threatening him; and (iv) retaliated against him in violation of Title VII by not promoting him and issuing him unfairly negative performance evaluations.

## DISCUSSION

### A. Standard of Review

Under Federal Rule of Civil Procedure 56(c), the court will grant summary judgment if the evidence submitted to the court shows that there is no genuine issue as to any material fact and that the movants are entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Furthermore, where a plaintiff cannot establish an essential element of his claim, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–33, 106 S.Ct. 2548. On a motion for summary judgment, the court views the record in the light most favorable to the

non-movants and resolves all ambiguities and draws all reasonable inferences against the movants. *See United States v. Diebold, Inc.*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Donahue v. Windsor Locks Bd. of Fire Commn'rs*, 834 F.2d 54, 57 (2d Cir.1987).

■ Claims of employment discrimination are analyzed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The burden initially falls upon the plaintiff to establish a prima facie case of racial discrimination in the terms and conditions of employment. To do so, plaintiff must show that: (1) he belongs to a protected class; (2) he was performing his duties satisfactorily; (3) he was subject to an adverse employment action; and (4) that the action occurred in circumstances giving rise to an inference of discrimination based on plaintiff's membership in that class. *See McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir.1997). The plaintiff's burden in establishing a prima facie case is de minimis. *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir.1994).

■ Once a plaintiff has established a prima facie case, the burden shifts to the defendant to proffer a legitimate, non-discriminatory reason for the adverse employment action. *Dawson v. Bumble & Bumble*, 398 F.3d 211, 216 (2d Cir.2005). Once a defendant articulates a reason, the burden shifts back to the plaintiff to prove, by a preponderance of the evidence, that the proffered reason for his adverse employment action was pretextual, and that a motivating factor was discrimination. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Courts are required to examine "the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" *Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir.2000) (citing *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)).

Although they are brought under different statutes, Plaintiff's New York Executive Law § 296 and NYC Administrative Code § 8–107 claims are all subject to the *McDonnell–Douglas* analysis. *See Knight v. New York City Housing Authority*, 2007 WL 313435, *10, 2007 U.S. Dist. LEXIS 9148, at *29 (S.D.N.Y.2007), (applying *McDonnell–Douglas* analysis to claims brought under New York Human Rights Law and New York City Administrative Code). Additionally, claims brought under 42 U.S.C. § 1981 are also analyzed under the *McDonnell–Douglas* framework.

**B. Certain of Plaintiff's Claims Must be Dismissed on Technical Grounds**

**1. Plaintiff's Age Discrimination Claims are Dismissed**

Other than stating that he was discriminated against based on his age, Plaintiff does not provide any allegations of age discrimination, and the record is devoid of any evidence that could plausibly be considered to support an age discrimination claim. Furthermore, Plaintiff does not mention the ADEA is his opposition brief, focusing only on his Title VII and New York state law claims of discrimination on the basis of race, religion, and national origin. (Def.Br.3.) Thus, Plaintiff has either abandoned his ADEA claim or has failed to raise a genuine issue of fact with respect to them. The ADEA claim is dismissed with prejudice.

### 2. Statute of Limitations Time Bars some of Plaintiff's Federal Claims

Many of Plaintiff's claims are time-barred, whether of discrimination or retaliation.

■ In this dual filing state, the statute of limitations extends back 300 days from the filing of the charge. As the charge was filed on August 8, 2003, claims relating to discrete acts of discrimination that occurred prior to October 11, 2002 are time barred under Title VII and the ADEA. Plaintiff's claims based on his transfer from Lincoln to Bellevue, which occurred in 1999, his claims based on performance evaluations that were given prior to October 11, 2002, his claims of discrimination and retaliation based on the disciplinary charge that was issued in June 2002 and adjudicated in August 2002—all are time barred by the statute of limitations.

■ This leaves Plaintiff with the following claims: (1) his performance evaluations dated December 10, 2002 and April 8, 2003, (2) the failure to allow Plaintiff to take off certain religious holidays in December 2002 and in 2003 constituted religious discrimination; (3) the failure to promote Plaintiff to Chemist III, which is not time barred because Plaintiff alleges that the position was not filled until March or April 2003. Plaintiff's hostile work environment claim also falls within the statute of limitations. Plaintiff contends that Morant threatened and intimidated him within 300 days of filing the EEOC charge. To the extent that this claim is based on Dr. Kaplan's habit of putting his finger to Plaintiff's face and micromanaging him, that behavior appears to have continued for a substantial period while Plaintiff was at Bellevue. The Supreme Court has held that:

> A hostile work environment claim is comprised of a series of separate acts that collectively constitute one "unlawful employment practice." 42 U.S.C. § 2000e–5(e)(1). The timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened. It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117, 122 S.Ct. 2061, 153 L.Ed.2d 106(2002).

### C. Title VII and Section 1981 Discrimination Claims

#### 1. Negative Performance Evaluations

■ Plaintiff alleges that Defendant "continuously charged [him] with performance mistakes and issued evaluations that did not accurately reflect [his] work performance." (Pl.Aff.¶ 19.) A discrete act of discrimination "occurred" on the day it "happened." *AMTRAK v. Morgan*, 536 U.S. 101, 110, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). Each negative performance evaluation is a discrete act. *Ledbetter v. Goodyear Tire & Rubber Co.*, —— U.S. ——, ——, 127 S.Ct. 2162, 2175, 167 L.Ed.2d 982 (2007) (citing *Morgan*, 536 U.S. at 114, 122 S.Ct. 2061); *see also O'Dwyer v. Snow*, 2004 WL 444534, *6, 2004 U.S. Dist. LEXIS 3528, at *19 (S.D.N.Y. March 10, 2004) (finding that a performance appraisal is a discrete act). This Court can only consider the two performance evaluations that were issued within the limitations period (those dated December 10, 2002 and April 8, 2003), as

well as performance warnings that occurred after October 11, 2002.

 In order to make out a prima facie case that the performance evaluations were discriminatory, Plaintiff must show that: (1) he belongs to a protected class; (2) he was performing his duties satisfactorily; (3) he was subject to an adverse employment action; and (4) that the action occurred in circumstances giving rise to an inference of discrimination based on plaintiff s membership in that class. *See McLee*, 109 F.3d at 134.

Plaintiff is a member of several protected classes, based on his race, religion, and national origin. Unfortunately, Plaintiff does not specify whether the discrimination he suffered in terms of his evaluations was attributable to his race, his ethnicity, or his religion. For purposes of this motion, I will assume all three.

There is a dispute regarding whether Plaintiff performed his duties satisfactorily. Defendant claims that Plaintiff's evaluations reflect his sub-standard performance while Plaintiff argues that the evaluations are the product of discrimination and retaliation.

However, nothing in the record indicates that Plaintiff was subject to an adverse employment action as a result of his evaluations. Therefore, he fails to make out a prima facie case of discrimination, (as opposed to retaliation; *see infra.*)

 The Second Circuit explained what is meant by "adverse employment action" in *Galabya:*

A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment. To be materially adverse a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially ad-

verse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation.

*Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir.2000) (internal quotation marks and citations omitted); *see also Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63–64, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (distinguishing the meaning of "adverse employment action" under Title VII's anti-retaliation provision from the meaning under Title VII's anti-discrimination provision). A negative employment evaluation, if accompanied by negative consequences, such as demotion, diminution of wages, or other tangible loss, may constitute an adverse employment action. *Whaley v. City Univ. of N.Y.*, 2008 U.S. Dist. LEXIS 35156, at *50 (S.D.N.Y.2008). However, "negative evaluations, standing alone without any accompanying adverse results, are not cognizable." *Bennett v. Watson Wyatt & Co.*, 136 F.Supp.2d 236, 247 (S.D.N.Y. 2001); *see also Valentine v. Standard & Poor's*, 50 F.Supp.2d 262, 284 (S.D.N.Y. 1999) ("Given that plaintiff's negative reviews did not lead to any immediate tangible harm or consequences, they do not constitute adverse actions materially altering the conditions of his employment."), *aff'd*, 205 F.3d 1327, 2000 WL 232048 (2d Cir.2000).

 Nothing in the record could be construed to indicate that Plaintiff suffered any negative consequences as a result of the negative evaluations. In his brief, Plaintiff claims that "Plaintiff meets the prima facie case ... [because] [a]n adverse action was taken against him in that ... plaintiff was evaluated inaccurately." (Pl. Br. P. 9.) The mere fact of a negative

evaluation does not constitute discrimination.

Neither does the record contain any evidence that the evaluations were given in circumstances suggesting that they were motivated by Plaintiff's race, his religion, or his ethnic heritage. Plaintiff was evaluated by Morant, an African American male, whom Plaintiff testified did not discriminate against him based on his race, religion, or national origin. (Siddiqi Dep. at 137:9–137:20.) There is also nothing in the record indicating that Plaintiff was subject to any ethnic, racial, or religious slurs. To survive a summary judgment motion, Plaintiff must point to something indicating that the evaluations were motivated by discrimination, as "even in the discrimination context, a plaintiff must prove more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997).

## 2. Failure to Promote

Plaintiff fails to make out a prima facie case that he was not promoted due to discrimination. Under the *McDonnell Douglas* burden shifting test, Plaintiff must establish that there is a prima facie case for discrimination by showing that "1) he is a member of a protected class; 2) his job performance was satisfactory; 3) he applied for and was denied promotion to a position for which she was qualified; and 4) the position 'remained open and the employer continued to seek applicants.'" *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 709 (2d Cir.1998) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. at 802, 93 S.Ct. 1817 (1973)).

Again, it is undisputed that Plaintiff is a member of a protected class.

Defendant claims that Plaintiff was not qualified for the Chemist Level III job because Plaintiff did not receive supervisory experience while at Bellevue or Plaintiff did not have three years of satisfactory experience at Bellevue, (Pl.Ex. B at 50:15–17, Ex. D.) The Chemist III position requires employees to have either satisfactory performance or supervisory experience. (Pl.Ex. C at PER0007.)

Plaintiff disputes that his experience was not satisfactory:

Mr. Siddiqi's educational background, long years of service and many years of evaluations with ratings that were not just merely satisfactory, but outstanding, both before plaintiff's transfer to Bellevue and after plaintiff's transfer back to Lincoln. In any case, at least two of Mr. Siddiqi's evaluations at Bellevue were at least satisfactory. Thus, plaintiff meets the prima facie case for a claim of discrimination.

(Pl.Br.9.) Of course, Plaintiff's conclusory statement is not evidence. Defendant's 56.1 statement contains factual allegations—which are deemed admitted—concerning Plaintiff's performance deficiencies. For example, Plaintiff has admitted to combining the test results from two patients' blood samples, resulting in an incorrect report that one patient was pregnant. (Pl.Ex. E at 000242.) He also admits that he accepted a two-day suspension because he did not properly report increased potassium level in a patient. He received three overalls scores of "needs improvement" on performance evaluations prior to transferring to Lincoln. As for the alternative three year supervisory requirement, Plaintiff does not claim to have had supervisory experience, other than on a few occasions when Plaintiff was put in charge while his supervisor was on vacation. (See Def. Ex. H.)

Plaintiff also fails to establish that a less qualified person got the job in circumstances tending to demonstrate discrimina-

tion. In his complaint, Plaintiff asserted that Morant got the position instead of Plaintiff. (Compl.¶14.) However, Defendant's Rule 56.1 Statement asserts that Morant was promoted to Chemist Level III in 2001, well before Plaintiff applied for the position. (56.1 Statement ¶54.) Defendant provides employment documents that prove this. (Pl.Ex. M.) Plaintiff offers no evidence to counter this, and his failure to contest the Rule 56.1 contention is an admission that Morant was already a Level III Chemist when Plaintiff applied for the job.

In his affidavit in opposition to this motion, Plaintiff states that a non-Muslim or Asian who was "less qualified and experience" than Plaintiff got the position. (Siddiqi Aff, ¶18.) Plaintiff does not identify who this mystery person, nor does he provide that person's credentials for comparison. At the summary judgment stage, Plaintiff must offer concrete evidence to support the claim. He has not done so.

For all of these reasons, Plaintiff fails to make a prima facie case that Defendant's failure to promote Plaintiff was discriminatory.

### 3. Failure to Give Plaintiff Religious Days Off

Plaintiff claims that defendant discriminated against him on the basis of his religion by refusing to grant two of three requests he made for permission to take days off for religious observance. The requested days off that were not allowed are February 13–14, 2003 and March 24–25, 2003.

There are two different forms of religious discrimination at issue here: failure to accommodate and unequal treatment based on religion. They will be discussed separately.

Title VII makes it unlawful for an employer "to fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual ... because of such individual's ... religion." 42 U.S.C. § 2000e–2(a)(1). Title VII does not explicitly define a failure to accommodate as discrimination; however, in a provision added in 1972, Title VII defines religion to include:

> all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

42 U.S.C. § 2000e(j). Courts interpret this provision to mean that "an employer cannot discriminate against any employee on the basis of the employee's religious beliefs unless the employer shows that he cannot reasonably accommodate the employee's religious needs without 'undue hardship' on the conduct of the employer's business.'" *Philbrook v. Ansonia Bd. of Educ.*, 757 F.2d 476, 481 (2d Cir.1985) (*citing* 42 U.S.C.2000e(j)), *aff'd, Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 107 S.Ct. 367, 93 L.Ed.2d 305 (1986).

In order to make a prima facie case of discrimination, a plaintiff must show that (1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; (3) he or she was disciplined for failure to comply with the conflicting employment requirement. *Philbrook*, 757 F.2d at 481; *see also Knight v. Conn. Dep't of Pub. Health*, 275 F.3d 156, 167 (2d Cir.2001); *Baker v. Home Depot*, 445 F.3d 541, 546 (2d Cir. 2006). If a plaintiff makes a prima facie case, "the burden shifts to the employer to show that it cannot reasonably accommo-

date the plaintiff without undue hardship on the employer's business." *Philbrook,* 757 F.2d at 481; *see also Knight,* 275 F.3d at 167.

■■ Here, the only issue is whether Plaintiff can maintain a claim for discriminatory failure to accommodate when he was not threatened with discipline if he failed to come to work. *Id.* He cannot.

The Second Circuit has never defined "discipline" within the context of the three-pronged religious discrimination test. A few courts in this district have equated discipline with "adverse employment action." *See e.g., Gueye v. Evans,* 2006 WL 3298427, at *6 (S.D.N.Y. Nov.13, 2006); *Garvin v. Potter,* 367 F.Supp.2d 548, 564 (S.D.N.Y.2005); *Reyes v. N.Y. State Office of Children & Family Servs.,* 2003 WL 21709407, **6–7, 2003 U.S. Dist. LEXIS 12644, at **17–18 (S.D.N.Y. July 22, 2003); *Durant v. Nynex,* 101 F.Supp.2d 227, 233 (S.D.N.Y.2000). For example, in *Gueye v. Evans,* the plaintiff sought the day off of work to observe Eid ul-Fitr. The defendant denied his request for the day off. The court found that the plaintiff failed to make a prima facie case of failure to accommodate religion because the plaintiff had "simply proffered no evidence that he was threatened with discipline were he not to have worked on Eid ul-Fitr." 2006 WL 3298427, at *6.

Likewise, the court found no religious discrimination in *Reyes.* In that case, the plaintiff was an ordained elder in the Presbyterian Church, which held ministry activities on Saturdays. *Reyes,* 2003 WL 21709407, *1, 2003 U.S. Dist. LEXIS 12644, at *2–3. The plaintiff requested that he be excused from working on Saturdays as an accommodation, a request which was denied by his supervisor. *Id.* 2003 WL 21709407, *2, 2003 U.S. Dist. LEXIS 12644 at *4. The plaintiff worked several of his scheduled Saturdays or used

his sick leave so that he could attend church. *Id.* 2003 WL 21709407, *2, 2003 U.S. Dist. LEXIS 12644 at *5. The court granted summary judgment for the defendant, finding that the plaintiff partially complied with the requirement to work Saturdays and was not disciplined for the days that he did miss. *Id.*

These courts have limited a plaintiff's ability to make out a claim of religious discrimination for failure to accommodate if there is no adverse employment action, which in this Circuit includes "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000).

■■ The threat of an adverse action may be sufficient to meet this element of the prima facie case. *See Gueye,* 2006 WL 3298427, at *6. However, in this record there is no evidence that the defendant ever threatened to discipline plaintiff if he took unauthorized days off. Of course, as Judge Berzon of the Ninth Circuit noted:

> If an employer tells an employee what he or she must do, the threat that an adverse employment action may be visited on the employee for failure to comply is implicit in the employment relationship; insubordination is always a potential basis for discharge or discipline.... Employees must do as they are told or suffer the consequences.

*Lawson v. Washington,* 319 F.3d 498, 503 (9th Cir.2003) (Berzon, J., dissenting from denial of rehearing en banc). However, this Court cannot infer that discipline would have resulted if Plaintiff had in fact not reported for work on the days he requested.

■ Furthermore, if Plaintiff had made out a prima facie case, Defendant has articulated a legitimated and non-discriminatory reason for denying the requests—inability to obtain coverage—and Plaintiff does not dispute that defendant was unable to obtain coverage, or offer any evidence that this reason was pretextual. Indeed, by failing to controvert defendant's Rule 56.1 Statement, Plaintiff has admitted that defendant was unable to find coverage for him!

These evidentiary failures dispose of Plaintiff's claim that not granting his requests for religious accommodation, in of themselves, constituted discrimination. However, viewing the evidence most favorably to Plaintiff (as I must on a motion for summary judgment), there is another claim lurking in this lawsuit: a claim that defendant refuses to give Muslims time off to observe their religious holidays but does give time off to adherents of other religions. If proved, this is a form of discrimination in the terms and conditions of employment—an impermissible favoring of one religious group over another—and so is barred by Title VII.

■ Plaintiff has made out a prima facie case of this form of religious discrimination. He claims that he and other Muslims were denied religious holidays when their Christian and Jewish co-workers were not. He offers, not just his own testimony, but affidavits from other Muslims who worked at Lincoln. All affiants attest that Dr. Kaplan regularly denied their requests to take off on religious holidays, and that non-Muslim employees were regularly granted leave for religious observance. The affiants do not name specific individuals or identify particular dates and times when Christians or Jews or Hindus or Buddhists were allowed time off for religious reasons; neither do they specify when their requests were denied.

But they certainly suffice to make out a prima facie case—especially since the same affiants claim that Kaplan berated and threatened them.

In its brief in opposition to the motion and in the Rule 56.1 Statement, Defendant does not address this theory. Therefore, this allegation of discrimination will be tried. Plaintiff is, however, put on notice that he will have to produce much more specific evidence of Kaplan's alleged discrimination in granting these holidays in order to survive a motion to dismiss at the close of his case.

## D. Title VII Retaliation Claims

Plaintiff claims Defendant retaliated against him for complaining about discrimination by giving him poor and inaccurate performance evaluations in October 2002 and 2003 and by failing to promote him to the Chemist III position.

■ In order to establish a prima facie case of retaliation, a plaintiff must show that: (1) he was engaged in a protected activity; (2) defendants were aware of the protected activity; (3) he was subjected to an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. *Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1178 (2d Cir.1996); *see also Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir.2003). If the plaintiff can show a prima facie case, the burden shifts to the defendant to proffer legitimate, non-retaliatory reasons for its actions. *Reed*, 95 F.3d at 1181.

### 1. Retaliation by Failure to Promote Plaintiff

■ Defendant is entitled to summary judgment on the claim that Defendant's failure to promote Plaintiff was retaliation for engaging in a protected activity be-

cause, as discussed above, Plaintiff was not able to establish that he was qualified for the position. Defendant could not have retaliated against Plaintiff by not promoting him to a position that he was not qualified to have.

## 2. Retaliation by Giving Plaintiff Poor Performance Evaluations

### A. Retaliation for Complaining about Discrimination

■ Plaintiff is able to meet some of the requirements of a retaliation claim. Plaintiff engaged in a protected activity by writing rebuttals to his performance evaluations of December 10, 2001 and April 11, 2003. Additionally, Defendant was aware of the protected activity, as Defendant sent a memorandum to Plaintiff acknowledging receipt of the rebuttal. (Pl.Ex. D at 000032.)

■ However, Plaintiff fails to show that he was subjected to an adverse employment action. Unlike in discrimination claims, negative performance reviews, standing alone, can be considered an adverse employment action. In *White*, the Supreme Court held that employer actions prohibited by Title VII's anti-discrimination provision are limited to conduct that affects the terms and conditions of employment, while under Title VII's anti-retaliation provision, the challenged action need not affect the terms and condition of employment in order to constitute unlawful retaliation. *White*, 548 U.S. at 63–64, 126 S.Ct. 2405. Thus, for the purposes of a retaliation claim, bad performance reviews are an adverse employment action.

However, Plaintiff actually received *higher* marks on his evaluations following his complaints of discrimination. For example, Plaintiff received an overall score of "needs improvement" for his December 10, 2002 evaluation. In response to the evaluation, Plaintiff wrote a rebuttal, claiming that the evaluators in Defendant's chemistry department were "malicious and discriminatory" and that technicians of foreign descent were unfairly blamed. (Def. Ex. G at 000048.) This was the first time that Plaintiff referenced discrimination in a rebuttal to an evaluation. In his next evaluation, on April 11, 2003, the final evaluation provided, Plaintiff's score was "satisfactory." Thus, Plaintiff's score improved after he complained that his evaluation was discriminatory. Therefore, there was no adverse employment action, and Plaintiff fails to make a prima facie case.

### B. Retaliation for Inquiring about his Job Status

Plaintiff claims, in his complaint, that Defendant retaliated against him for inquiring about his promotion application. Since inquiring about a job application is not a protected activity, Plaintiff fails to make a prima facie case.

### E. Hostile Work Environment Claim

Plaintiff alleges that Defendant created a hostile work environment. He contends that the following behavior contributed to this environment: Dr. Kaplan repeatedly waved his finger in Plaintiff's face and threatened him; Dr. Kaplan micromanaged Plaintiff; Dr. Kaplan created an atmosphere of intolerance against Muslim employees generally; and Morant physically intimidated and threatened plaintiff on the July 18, 2003.

■ "To defeat a motion for summary judgment on a racially hostile work environment claim, 'a plaintiff must produce evidence that the workplace [wa]s permeated with discriminatory intimidation, ridicule, and insult, that [wa]s sufficiently severe or pervasive to alter the conditions of the victim's employment.'"

*Patterson v. County of Oneida, N.Y.,* 375 F.3d 206, 227 (2d Cir.2004) (quoting *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 570 (2d Cir.2000) (internal quotation marks omitted)). The harassment must be " 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " *Terry v. Ashcroft,* 336 F.3d 128, 147–48 (2d Cir.2003) (quoting *Alfano v. Costello,* 294 F.3d 365, 373 (2d Cir.2002) (internal quotations omitted)). A court should look at the "totality of the circumstances" and consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Harris v. Forklift Systems,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). Where reasonable jurors could disagree as to whether alleged incidents of racial insensitivity or harassment would have adversely altered the working conditions of a reasonable employee, the issue of whether a hostile work environment existed may not properly be decided as a matter of law. *Patterson,* 375 F.3d at 227.

In analyzing the evidence, the July 2003 incident between plaintiff and Morant must be entirely discounted. A hostile work environment can only be created based on one or more of the forbidden considerations under Title VII; that is, the work environment must be hostile because of the plaintiff's race, religion, ethnicity or gender. As Justice Scalia once noted, Title VII is not a "general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs.,* 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).

Plaintiff testified under oath that the reason Morant threatened him was because Plaintiff threatened to reveal something that occurred in 1987. Even if a single incident could create a hostile work environment—and it is rare indeed when that is so—because this particular incident was not occasioned by a statutory factor, it cannot be the basis for a claim of Title VII hostile work environment.

So the issue is whether a reasonable juror could infer that the workplace was permeated with anti-Muslim hostility based on Plaintiff's description of Dr. Kaplan's behavior, as confirmed and bolstered by statements from Muslim co-workers. Frankly, the evidence is thin, but I conclude that Plaintiff has crossed the threshold. If Plaintiff proves that Dr. Kaplan "always" put his finger in Plaintiff's face, and repeatedly threatened him and other Muslim co-workers during Siddiqi's four years at Bellevue, then a trier of fact might conclude that Dr. Kaplan adversely altered the working conditions of a reasonable Muslim employee.

### F. NYSHRL and NYCHRL Claims

NYSHRL and NYCHRL each have three-year statute of limitations periods. *See* C.P.L.R. 214(2) (three year statute of limitations for New York State Human Rights Law); New York City Admin. Code § 8–502(d) (same for New York City Human Rights Law). The statute of limitations is tolled during the period in which a complaint is filed with the EEOC. *See Martinez–Tolentino v. Buffalo State College,* 277 A.D.2d 899, 715 N.Y.S.2d 554, 555 (4th Dept.2000). Because Plaintiff filed his complaint with the EEOC on August 7, 2003, events alleged to have occurred on or after August 7, 2000 are timely.

This means that some of Plaintiff's time barred federal discrimination claims are not time barred under state and local law. While plaintiff's wrongful transfer claim is barred, his claims relating to evaluations given on December 29, 2000, December 10, 2001, and December 15, 2002 are not.

However, those claims must nonetheless be dismissed. New York State and New York City evaluate claims of discrimination using the same standards as Title VII and the *McDonnell–Douglas* tripartite analysis is the framework within which the evidence is analyzed. *See Knight v. New York City Housing Authority*, 2007 WL 313435, \*10, 2007 U.S. Dist. LEXIS 9148, at \*29 (applying *McDonnell–Douglas* analysis to claims brought under New York Human Rights Law and New York City Administrative Code). Because Plaintiff offers no evidence that he suffered any adverse employment action as a result of the negative evaluations (remembering that, for purposes of discrimination, a negative evaluation is not an adverse employment action), and no evidence tending to suggest that the evaluations were occasioned by his race, ethnic background or religion, he has failed to make out a prima facie case of discrimination under state and local as well as federal law. (In this regard, it is important to reiterate that there is no evidence that Kaplan evaluated plaintiff; Morant and Vernon did. But the only evidence of anti-Muslim hostility in the record before the court is hostility from Kaplan).

Plaintiff's claims that his June 2002 disciplinary charge was retaliatory is also not time barred under state law. However, this claim fails because no reasonable trier of fact could conclude, on the facts admitted due to Plaintiff's failure to respond to Defendant's Rule 56.1 Statement, that protected activity led to this disciplinary proceeding. First, plaintiff has admitted to what, from the vantage point of a reasonable trier of fact is an egregious instance of misbehavior: Plaintiff was disciplined because he failed to tell a doctor about a test result showing that a patient had a highly elevated level of potassium in his system, lied about the test result in his written report (stating that he was "unable to perform the test" rather than give what he thought was an inaccurate result), and then refused a direct order to explain his extraordinary conduct. Given those admitted facts (admitted in the context of this lawsuit, not in the "no contest" plea that plaintiff entered), it would be impossible for any trier of fact to conclude that the disciplinary proceeding was motivated by anything other than Plaintiff's inexplicable and unprofessional behavior.

Furthermore, this proceeding could not have been commenced in retaliation, because plaintiff's first complaint of discrimination in the evaluation process came after the disciplinary proceeding concluded—in his response to his the evaluation he received for the period in which his misconduct occurred. Since no protected activity occurred prior to the discipline, no reasonable trier of fact could impute a retaliatory motive to Defendant.

Therefore, this state law claim, while not time-barred, does not warrant a trial, and Defendant's motion for summary judgment dismissing it is granted.

### *CONCLUSION*

For the foregoing reasons, Defendant' motion is GRANTED in part and DENIED in part. The final pre-trial conference will be held on October 24, 2008 at 2:00 p.m. At that point, the parties will be on 48 hours notice for trial.

This constitutes the decision and order of the Court.